GENERAL INSURANCE COMPANY OF AMERICA, a Washington corporation, Plaintiff-Appellee,

v.

LAMAR CORPORATION, a Michigan corporation, also known as Lamar Pipe Company, Defendant-Appellant.

No. 72-1789.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1973.

Decided July 31, 1973.

William E. Rheaume, Lansing, Mich., for appellant; Abood, Abood & Abood, Lansing, Mich., on brief for Lamar Corp.

Stephen C. Bransdorfer, Grand Rapids, Mich., for Concrete Pipe Assn. of Michigan as amicus curiae; Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., on brief, amicus curiae, for Concrete Pipe Assn. of Michigan, Inc.

John A. Kruse, Detroit, Mich., for appellee; Harvey, Kruse & Weston, Detroit, Mich., on brief for General Ins. Co. of America.

Before WEICK, McCREE, and KENT,* Circuit Judges.

McCREE, Circuit Judge.

This appeal presents primarily the question whether under the Michigan Building Contract Fund Act of 1931, M. C.L.A. §§ 570.151–570.153,[1] money paid

---

* Judge Kent died on May 28, 1973 and did not participate in this decision.

1. The Michigan Building Contract Fund Act provides:

570.151 *Building contract fund; status as a trust fund*

Sec. 1. In the building construction industry, the building contract fund paid

to a contractor performing a public project constitutes a trust fund for the payment of subcontractors and materialmen for labor and material furnished on that project. We determine that it does not and reverse the judgment of the district court.

Defendant-appellant Lamar Corporation (Lamar), a manufacturer of cement pipe, appeals from a judgment for plain-

tiff-appellee General Insurance Company (General), a surety on a payment and performance bond. Sheldon Contracting, Inc. (Sheldon), had contracted with the city of Marysville, Michigan, to construct a sewer, and, as required by Michigan law,[2] obtained payment and performance bonds from General. The bonds named Sheldon principal and the city of Marysville and the subcontrac-

by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes. As amended P.A. 1966, No. 104, § 1, Eff. Oct. 1.

**570.152 Same; fraudulent detention or use by contractor or subcontractor, penalty**

Sec. 2. Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court.

**570.153 Same; evidence of fraudulent detention or use**

Sec. 3. The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

2. M.C.L.A. § 129.201 (1967) provides:
*129.201 Bonds of principal contractor on public building, work, or improvement*

Sec. 1. Before any contract, exceeding $5,000.00 for the construction, alteration or repair of any public building or public work or improvement of the state or a county, city, village, township, school district, public educational institution, other political subdivision, public authority or public agency, except the state highway department, hereinafter referred to as the "government unit", is awarded, the proposed contractor, hereinafter referred to as the "principal contractor", shall furnish at his own cost to the governmental unit a performance bond and a payment bond which shall become binding upon the award of the contract to the contractor. Neither the invitation for bids, nor any person acting, or purporting to act, on behalf of the governmental unit shall require that the bonds be furnished by a particular surety company, or through a particular agent or broker, or through a company, agent or broker in any particular locality. P.A. 1963, No. 213, § 1, Eff. Sept. 6.

M.C.L.A. § 570.101 (1967) provides:

*570.101 Bond of contractor on public works to secure payment for materials and labor*

Sec. 1. When public buildings or other public works are about to be built, repaired or ornamented under contract at the expense of the state, or of any county, city, village, township or school district thereof, it shall be the duty of the board of officers or agents, contracting on behalf of the state, county, city, village, township or school district, to require sufficient security by bond for the payment by the contractor of all subcontractors and for the payment for all labor performed and materials and certain supplies furnished and used in the erection, repairing or ornamenting of such public buildings or works.

tors, laborers, and material suppliers of Sheldon on the Marysville job obligees. Lamar is a materialman that supplied sewer tile worth $43,243.16 for the Marysville project. Before Lamar began supplying materials on the Marysville job, Sheldon owed it $50,635.05 on open account, and during the period when Lamar was supplying this tile, Sheldon paid it a total of $80,555.86, which Lamar first applied to the old indebtedness and to debts incurred by Sheldon on other projects under construction contemporaneously with the Marysville job.

Sheldon defaulted before the Marysville project was completed, and General, its surety, was required under the obligation of its performance bonds to complete the job. In doing so, General incurred costs in excess of $40,000 and brought this action against Lamar for the excess Lamar received from Sheldon over the cost of materials it supplied for the Marysville project. Lamar counterclaimed for $25,974.41, the balance it claimed was due on the Marysville job, but the district court did not discuss the counterclaim in its findings and conclusions and Lamar does not press the matter on appeal.

The district court, sitting without a jury, found that the money paid to Lamar by Sheldon during the period in question came entirely from the Marysville job even though Sheldon was working on other jobs at the time. It also found that Lamar knew the source of these funds and that Lamar had "an affirmative duty to apply the payments received first to the discharge of the indebtedness incurred for materials supplied on the City of Marysville job." The court accordingly determined that the funds paid by the city of Marysville to Sheldon constituted a trust fund under the provisions of M.C.L.A. § 570.-151; that in the alternative, independent of the statute, Lamar was a constructive trustee for the other materialmen; that the funds did not lose their trust character when Sheldon paid Lamar; and that Lamar is therefore obligated to repay General as subrogee of the beneficiaries of the trust $37,312.70 with interest from the date of the last payment by Sheldon.

On appeal, Lamar and amicus curiae Concrete Pipe Association of Michigan, Inc., attack both the factual findings and the legal conclusions of the district court. However, in the view we take of the case, it is unnecessary to determine whether the findings of fact are correct, although we observe that a review of the evidence reveals that the only facts about which any dispute exists depend upon an assessment of credibility, a function of the district court in which an appellate court should indulge the better perspective of the trial judge. *See* Fed.R.Civ.P. 52(a).

Because this is a diversity case, our duty is to decide the appeal as the law and policy of Michigan commands. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947). The principal issue of Michigan law for our consideration is whether the Michigan Building Contract Fund Act applies to public as well as to private projects. Resolution of this issue requires reconciliation of the two Michigan Supreme Court cases in which the Act has been interpreted.

In Club Holding Company v. Flint Citizens Loan & Investment Company, 272 Mich. 66, 261 N.W. 133 (1935), a subcontractor on a municipal construction project assigned the funds due it from the principal contractor to a bank that was financing the subcontractor's operations. The bank applied the funds received from the contractor to the debt owed by the subcontractor on the construction project and to unassociated debts of the subcontractor. The subcontractor, however, had not notified the bank of certain debts it owed to materialmen on the municipal sewer project. After one materialman recovered against the contractor's surety for its debt, People for use of Youngs v. United States Fidelity & Guaranty Company, 263 Mich. 638, 249 N.W. 20 (1933), the contractor sued the bank to impress a

trust by virtue of the Building Contract Fund Act on the funds received by the bank from the contractor. In affirming a judgment for the defendants, the Michigan Supreme Court held that the act did not create a civil cause of action and did not apply to the construction of public projects:

> Section 2 defines the statutory fraud and provides a penalty, while section 3 states what shall be evidence of intent to defraud. The act affects those matters which are criminal in their character and creates a particular statutory crime. The civil rights and obligations existing between owners, contractors, subcontractors, materialmen and the various trades, etc., seem to be undisturbed by the act.

> To hold in the instant case that the Investment Company received such assigned funds in a trust capacity might require a similar application to moneys the subcontractor might pay anyone, including his butcher, baker, or candlestick maker, and such a holding might possibly relieve the principal contractor's surety from the obligations imposed by Act No. 187, Pub. Acts 1905, as amended, being [3] Comp. Laws 1929, §§ 13132–13136, and bonds given pursuant thereto. The act in question stands alone, without any reference to another; it is in harmony with the various provisions of the mechanics' lien law, and we cannot presume, in the absence of explicit language, that it was intended to apply to the erection of public buildings or to public works. To do so might have a nugatory effect on the provisions of the 1905 act as amended, and strike from the books a line of well-understood and established authorities. It is fundamental that the law does not favor repeal by implication and that penal statutes must be strictly construed.

272 Mich. at 72, 261 N.W. at 135.

The second time the Michigan Supreme Court had occasion to interpret this statute was in B. F. Farnell Company v. Monahan, 377 Mich. 552, 141 N. W.2d 58 (1966). In that case, a contractor received payment for work performed on a private construction contract and shortly thereafter filed a voluntary petition in bankruptcy and delivered the contractual payment to the trustee in bankruptcy instead of to the materialmen and subcontractors working on the job. The materialmen brought suit under the Building Contract Fund Act for civil relief against the contractor. Overruling the first ground for decision in *Club Holding*, the Michigan Supreme Court reversed the trial court's dismissal of the case and held that the Building Contract Fund Act created a civil remedy: "When a statute provides a beneficial right but no civil remedy for its securance, the common law on its own hook provides a remedy, thus fulfilling law's pledge of no wrong without a remedy." 377 Mich. at 555, 141 N.W. 2d at 60, *citing* Ferguson v. Gies, 82 Mich. 358, 46 N.W. 718 (1890), and Creek v. Laski, 248 Mich. 425, 227 N.W. 817 (1929). The court summarized the effect of its decision on *Club Holding* in this way:

> *To conclude:* It is clear that a contractor or subcontractor, by delivering to his trustee in bankruptcy what he himself holds as trustee under the act of 1931, cannot thereby defeat the common law remedy this Court has provided in favor of those who under the act are aggrieved by his statutory violation. Whether defendant's act of turning the funds over to his trustee did or did not place such funds beyond the reach of plaintiff is beside the point. Plaintiff had the remedy it seeks to pursue, as against the defendant, when the latter retained or used the funds as charged in its complaint. That remedy was not destroyed either by defendant's voluntary petition in bankruptcy or by his voluntary payment to the trustee in bankruptcy of that which was not his. *To the extent Club Holding collides with these*

*views, Club Holding should be overruled.*[4]

> [4] An examination of all briefs filed for and against reversal of *Club Holding* discloses that the common-law doctrine to which Michigan became committed by Stout v. Keyes [2 Doug. (Mich.) 184] Ferguson v. Gies and Creek v. Laski, all *supra,* was neither urged upon the Court nor discussed by any counsel in the case. No one of the three cases was cited or mentioned. The thrust of the argument made by the complaining parties turned exclusively upon their request for a decree of constructive trust. Such is the reason, doubtless, for omission of reference to said doctrine by the court.

377 Mich. at 557–558, 141 N.W.2d at 61 (emphasis added).

■ The italicized language in the last sentence of the above quotation makes it clear that any pronouncements in *Club Holding* that do not concern the creation of a civil remedy by the Act remain unaffected. Accordingly, the decision in *B. F. Farnell* did not extend the reach of the statute to "the erection of public buildings or to public works." *Club Holding, supra,* 272 Mich. at 72, 261 N.W. at 135. We must follow the construction given the Act by the Michigan Supreme Court, and we therefore hold that the Act does not make funds paid on public projects a trust fund in the hands of a contractor.

Our conclusion is consistent with the apparent purpose of the type of legislation of which the Michigan statute is representative.

The legislative history of the Michigan statute itself is obscure. The briefs of the parties do nothing to illuminate it, and our research has not disclosed the exact circumstances of the statute's enactment. Nevertheless, the date of its passage, 1931, identifies the act as one of a genre of Depression-era measures intended to afford relief to subcontractors and materialmen in the construction industry.

During the boom period of the 1920's, speculative builders often undertook to construct projects too large for their available capital to finance, and they frequently paid suppliers and materialmen on older projects with funds received as payment on more current operations. With the advent of the crash of 1929 and the consequent widespread insolvency of many building contractors, these pyramided empires also collapsed and many subcontractors and suppliers were never paid. Subcontractors and materialmen on private projects were left only with mechanics' liens as remedies, and these were often ineffective. *See generally* Grossman, Trust and Penal Provisions of the New York State Mechanics' Lien Law, 5 Brooklyn L.Rev. 14, 16–22 (1935).

On the other hand, suppliers of labor and material on public projects were protected by statutorily required payment and performance bonds.[3] These bonds required for public projects were intended "to afford protection to the suppliers of labor or materials, similar to that afforded under the mechanics' lien laws in the case of private buildings or construction." Annot., 92 A.L.R.2d 1250, 1257 (1963). Mechanics' or materialman's liens ordinarily do not apply to public projects. *E.g.,* Lake States Engineering Corporation v. Lawrence Seaway Corporation, 15 Mich. App. 637, 651, 167 N.W.2d 320 (1969).

When Depression-era experience demonstrated the inadequacy of mechanics' liens in many cases because the owner had a defense if he had paid the principal contractor, statutes like the Michigan Act of 1931 were enacted to afford a "supplement to the Mechanics' Lien Law,"[4] providing a more effective remedy for private project suppliers against their principal contractors than they had previously. It does not appear, in the usual case, that these measures were meant to apply also to public projects since subcontractors on those jobs were adequately protected by statutorily required bonds. The pattern appears to

3. *See, e. g.,* note 2 *supra.*

4. State v. Tobasso Homes, 42 Del. 110, 3 Terry 110, 117, 28 A.2d 248, 252 (1942).

be one of providing only a single civil remedy for subcontractors on public projects. *See, e.g.* 6 Del. C. § 3502, 29 Del.C. § 6902 (1953); Cal. Civil Code § 3247 (Supp. 1973); Kent. Rev.Stat. § 376.210. The New York Statute, N.Y. Lien Law § 70 et seq. (McKinney's Consol.Laws, c. 33, 1966), is a notable exception. That act was originally passed in 1929, before there was any provision requiring bonds on public projects, *see* N.Y. State Finance Law § 137 (McKinney's Consol.Laws, c. 56, 1940), and the extremely detailed act clearly applies to both public and private projects. We have been directed to the law of no other jurisdiction in which subcontractors and materialmen on public projects have been afforded two separate and complete remedies when a principal misapplies moneys due them on projects. We are unpersuaded that the Michigan Supreme Court intended to create a dual remedy by its decision in *B. F. Farnell*.

 The district court appears to have held alternatively that, independently of the statute, a constructive trust was imposed on the funds paid to Lamar by Sheldon, on the theory that Lamar knew of the source of the funds and was therefore under a duty to apply the funds so as to protect the other suppliers on the Marysville project. *See* St. Paul Fire & Marine Insurance Company v. United States, 309 F.2d 22 (8th Cir. 1962); Savage v. Nee, 212 Cal.App.2d 417, 28 Cal.Rptr. 106 (1963). Appellee does not press this theory on appeal, with good reason in our opinion, because it appears that under Michigan law, Lamar was under no duty to apply the funds to the Marysville account in the absence of fraud or an express direction by Sheldon. *See* People for the Use of Michigan Electric Supply Company v. Vandenburg Electric Company, 343 Mich. 87, 72 N.W.2d 216 (1955); *Club Holding, supra*, 272 Mich. at 72–73, 261 N.W. 133; Grace Harbor Lumber Com-

pany v. Ortman, 190 Mich. 429, 157 N.W. 96 (1916).

Our decision makes it unnecessary for us to reach the other issues raised by appellant and amicus.

The judgment of the district court is reversed.