NIB FOODS, INC. v MALLY

1. CONTRACTS—SUPERCEDING CONTRACTS—SAME SUBJECT—SAME PAR-
   TIES—CONFLICTS.

   A later contract between the same parties supercedes and re-
   scinds an earlier agreement and is the sole agreement of the
   parties where the subsequent contract completely covers the
   same subject, but contains terms inconsistent with those of the
   prior agreement, and where the two documents cannot stand
   together; where two agreements between the same parties are
   not completely inconsistent they may be construed together as
   part of the total accord with the second document superceding
   only those portions of the prior agreement with which it is in
   conflict.

2. VENDOR AND PURCHASER—REAL PROPERTY—RESTRICTIVE COVE-
   NANTS—EQUITY—INJUNCTION.

   A court of equity can enjoin a vendor of real property and those
   in privity with him who have notice of a restrictive covenant
   from violating the covenant.

3. VENDOR AND PURCHASER—REAL PROPERTY—RESTRICTIVE COVE-
   NANTS—NOTICE—CONVEYANCE.

   A vendee of real property is charged with notice of a restrictive
   covenant affecting the vendor's right to convey where the
   vendee receives notice after signing a sale agreement but
   before the actual conveyance.

4. VENDOR AND PURCHASER—REAL PROPERTY—OBLIGATIONS—COMMON
   GOALS.

   Both a vendor of real estate and his vendee are required to be

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts § 458 *et seq.*

[2, 3] 20 Am Jur 2d, Covenants, Conditions, and Restrictions §§ 304,
   305, 312–314, 317, 329.

   77 Am Jur 2d, Vendor and Purchaser § 210.

   Personal covenant in recorded deed as enforceable against grantee's
   lessee or successor. 23 ALR2d 520.

[4] 77 Am Jur 2d, Vendor and Purchaser § 4 *et seq.*

cognizant of their obligations where they are pursuing a common goal.

Appeal from Oakland, John N. O'Brien, J. Submitted June 17, 1976, at Detroit. (Docket No. 26168.) Decided August 5, 1976.

Complaint by Nib Foods, Inc., against Chester F. Mally, Laura L. Mally, Lorlane-Stephenson Company, Michigan Forging Company, Quality Inns International, Inc., and Midway Lodge, Inc., seeking preliminary and permanent injunctions to prevent the sale of certain real property in violation of a restrictive covenant. Judgment for defendants. Plaintiff appeals. Reversed and remanded.

*Miller, Canfield, Paddock & Stone* (by *Carl H. Von Ende),* for plaintiff.

*Steven N. Andrews (Charles J. Porter,* of counsel), for defendants.

Before: V. J. BRENNAN, P. J., and N. J. KAUFMAN and R. H. CAMPBELL,* JJ.

V. J. BRENNAN, P. J. On July 31, 1975, Judge John N. O'Brien dismissed with prejudice as against all defendants plaintiff's complaint Count V, which requested preliminary and permanent injunctions to prevent defendants from consummating the proposed sale of a parcel of real property by defendants Mally to defendant Midway Motor Lodge, Inc., for the purpose of constructing a motor lodge and restaurant. The trial judge also cancelled the notice of *lis pendens* which plaintiff had filed on the real estate parcel belonging to defendants Mally. Plaintiff filed a claim of appeal

---

* Circuit judge, sitting on the Court of Appeals by assignment.

on August 13, 1975. To comply with the provisions of GCR 1963, 518.2, Judge O'Brien, on October 8, 1975, amended the judgment to adjudicate finally the issues presented in Count V of the complaint and the notice of *lis pendens.* On the same date, plaintiff filed a claim of appeal from the amended judgment. Judge O'Brien granted an order cancelling the notice of *lis pendens* on December 17, 1975. This Court, on January 15, 1976, stayed the order cancelling *lis pendens* pending appeal of the lower court decision.

This controversy originated from the transfer of an interest in a Howard Johnson's Restaurant and Cocktail Lounge in Madison Heights, Michigan. Defendants Chester S. Mally and Laura L. Mally are sole shareholders of Lorlane-Stephenson Company and Michigan Forging Company, two Michigan corporations. Prior to the agreement of transfer, the Howard Johnson's business and the assets of the restaurant were owned by Lorlane-Stephenson and Michigan Forging. In addition, Michigan Forging owned the restaurant building and the adjacent parking areas. Plaintiff Nib Foods, formerly Brenda, Inc., a Michigan corporation, owned several restaurants in the area.

On July 7, 1969, Brenda, Inc., signed an agreement with Michigan Forging, Lorlane-Stephenson, and Mr. and Mrs. Mally on the transfer of the Howard Johnson's restaurant. One part of the agreement called for the sale of the restaurant business and assets by Lorlane-Stephenson and Michigan Forging to plaintiff for $140,000 payable at the closing date by a down payment and a promissory note. In addition, Michigan Forging agreed to lease to plaintiff the restaurant building and the adjacent parking areas for a period of 20 years for an annual rental of $25,000. The para-

graph of the agreement dealing with the lease arrangement contained the following covenant:

"During the term of the lease, neither the lessor, *Lorlane,* nor Chester F. Mally nor Laura L. Mally, shall have an interest, either direct or indirect, in any other restaurant or *retail* beverage business located within a radius of ten (10) miles from the Restaurant, or lease *or sell* any facility *or land* to any other restaurant or *retail* beverage business located within a radius of two (2) miles from the restaurant. However, excepted from this provision are: (i) the restaurant facility now leased by Chester Mally to Biff's, and (ii) the restaurant facility currently operated by Herb Book *at noteastern* (sic) *corner of Ten Mile Rd & Northwestern Hwy. The signatures of Chester and Laura Mally on this agreement relate solely to their obligations under this paragraph."* [Italicized portions were added in writing by plaintiff to the typed agreement.]

Closing date was not later than July 31, 1969. According to the trial testimony of Ira Hyams, Vice-President of Nib Foods, at the time of the agreement there was no question that the Mallys were to join in the restaurant covenant and that there would be no competition in the vicinity of the Howard Johnson's restaurant.

Because of the delay in the approval of the transfer of the liquor license from Lorlane-Stephenson Company to Nib Foods, the parties agreed by a series of memoranda to extend the closing date of the agreement. The first memorandum, signed by Brenda, Michigan Forging, Lorlane-Stephenson, and Mr. and Mrs. Mally, extended the agreement to September 30, 1969. A second memorandum further extended the consummation date to October 31, 1969. The third memorandum, which extended the closing date until November 30, 1969, unlike the first two, was signed only by

Nib Foods, Michigan Forging, and Lorlane-Stephenson Company. Mr. and Mrs. Mally did not sign in their individual capacities.

In spite of the delays in the formal closing, Nib Foods took over the operation of the restaurant. By an agreement dated August 26, 1969, Nib began operating the Howard Johnson's restaurant in September, 1969. On November 13, 1969, the parties finally consummated the agreement. In a document signed by Michigan Forging, Lorlane-Stephenson, and Nib Foods, Michigan Forging agreed to lease the restaurant building and adjacent parking areas to Nib. In addition, Lorlane-Stephenson agreed to sublet a parking area to the lessee, Nib. One paragraph of the document contained the following covenant:

"Covenant Not to Compete: (39)

"During the Term and/or Option Term of this Lease Agreement, the Lessor, shall have no interest, either direct or indirect, in any other restaurant or retail beverage business located within a radius of ten (10) miles from the Restaurant, or lease or sell any facility to any other restaurant or retail beverage business located within a radius of two (2) miles from the Restaurant. However, excepted from this provision are: (i) the restaurant facility now leased by Chester Mally to Biff's, and (ii) the restaurant facility currently operated by Herb Book at the northeastern corner of Ten Mile Road and Northwestern Highway."

Mr. and Mrs. Mally did not sign this lease in their individual capacities.

Over the next several years, Chester Mally attempted to negotiate an agreement with Nib Foods on the construction of a motor lodge on the adjoining property, which Mr. and Mrs. Mally owned in joint tenancy. A letter of June 7, 1971, from Mally to Ira Hyams indicated Mally's discontent over the

failure of the two parties to agree. On October 26, 1972, Mally's attorneys proposed an amendment to the lease which would permit development of the adjacent land. This proposal was rejected on November 1, 1972. Ira Hyams testified that on one occasion Chester Mally telephoned him with a proposal to buy back the Howard Johnson's restaurant.

In the fall of 1973, plaintiff became suspicious that the Mallys were negotiating an agreement to sell the adjacent property for the purpose of constructing a Quality Court Motel and Restaurant. On October 30, 1973, plaintiff filed a complaint in Oakland County Circuit Court seeking an injunction to restrain the real estate sale transaction. In connection with this complaint, plaintiff, on December 20, 1973, filed notice of *lis pendens* on defendant's property. Apparently, the negotiations with Quality Court fell through, because, according to the testimony of Ira Hyams, vice-president of plaintiff corporation, in July, 1974, Chester Mally blamed plaintiff for frustrating Mally's business interests.

Shortly after plaintiff filed a notice of *lis pendens,* Mr. and Mrs. Mally signed an agreement of sale with Interstate Realty, Inc., for the transfer of the Mallys' real estate adjacent to the Howard Johnson's restaurant. According to the testimony of Chester Mally, in December, 1973, he received an inquiry from Thompson-Brown Realty about his parcel of land. In negotiating the agreement with Interstate, Mally did not discuss the buyer's requirement or its proposed use. Nor did he discuss the restrictive covenant with Brown Realty. Mally signed the deed and delivered it in escrow. The purchase price has not been paid. The agreement of sale was to be consummated by delivery of a

warranty deed conveying marketable title. The agreement contained no time limit for acceptance.

Interstate Realty was an association composed of the Esser Paint Company and Terry Carrick. Carrick, an independent, searched for motel sites for, among others, Midway Motor Lodge, Inc.; Esser Paint Company was a prospective franchisee of a Midway Motor Lodge. Chester Mally testified that he never negotiated to sell or lease this property to Midway Motor Lodge, Inc.

In order to secure a zoning waiver for the parking area, Interstate Realty filed a petition with the Madison Heights Planning Department to review its site plan. On September 16, 1975, the planning department received plans for a Midway Motor Lodge. At zoning board meetings of November 20, 1974, and December 4, 1974, Chester Mally appeared on behalf of Interstate Realty requesting the parking waiver.

On January 24, 1975, plaintiff filed an amended complaint, Count V seeking an injunction to prevent the sale of the Mallys' real estate and adding Midway Motor Lodge, Inc., as defendant.

In March, 1975, Esser Paint Company withdrew its bid for a Midway Motor Lodge franchise. In the following month, Swissdale, a partnership composed of Terry Carrick and Edward Juedtke, owner of Midway Motor Lodge, Inc., purchased Interstate Realty's interest in the Mally property and took over the motel project. At the time of the trial, Swissdale was pursuing a financing scheme, and could not close the agreement until a bank loan was forthcoming.

After a hearing, Judge O'Brien ruled in favor of defendants in an opinion of July 31, 1975. The trial judge ruled that the Mallys and the two corporate defendants owned by Mally operated

with one mind, and that the Mallys intended to be bound by the original covenant in the agreement. However, plaintiff had not satisfied the burden of proving that defendants Mally sold the parcel with knowledge of the buyer's intended restaurant business use. In addition, the covenant, which was drafted by plaintiff, created no positive duty on the part of defendants Mally to enforce the use restriction.

Plaintiff appeals from the adverse judgment on its request for injunction and from the cancellation of notice of *lis pendens.* Defendants cross-appeal from the trial judge's finding that Mr. and Mrs. Mally are bound by the covenant in the July 7, 1969, agreement.

On appeal, two issues are raised, the first of which is whether the covenant in the first agreement merged into the subsequent lease so that defendants Mally were free to sell adjacent real estate to a competing enterprise.

We recognize that if parties to a prior agreement enter a subsequent contract which completely covers the same subject, but which contains terms inconsistent with those of the prior agreement, and where the two documents cannot stand together, the later document supercedes and rescinds the earlier agreement, leaving the subsequent contract as the sole agreement of the parties. *Joseph v Rottschafer,* 248 Mich 606, 610; 227 NW 784 (1929).

However, we do not find this situation to be the case here. We believe the agreement and the lease are not inconsistent but may be construed together as part of the total accord. The transfer of the Howard Johnson's restaurant involves four sepa-

rate provisions. First, the restaurant business, the goodwill,[1] is transferred to Nib Foods. Second, Lorlane-Stephenson and Michigan Forging transfer the inventory of the business to plaintiff. These two provisions cost plaintiff $140,000. Third, Michigan Forging leases to Nib the restaurant building. Fourth, Michigan Forging leases the surrounding parking area to the new proprietor. These latter two provisions cost plaintiff $25,000 per year.

The November 13, 1969, document covers only the third and fourth provision, the lease of the building and surrounding premises. The agreement of July 7, 1969, is more comprehensive, covering the sale of a business and the business assets. Therefore, the second document should supercede only the lease portions of the prior agreement. If the second document covers only the lease, the covenant not to compete in paragraph 39 controls the lessor-corporations, Michigan Forging and Lorlane-Stephenson. These two corporations are forbidden by that provision from leasing or selling facilities to competing restaurants within two miles. The sale of the business in the first agreement involves separate consideration of $140,000 and can carry a separate covenant not to compete. The first agreement did have an additional covenant, that the individuals, Mr. and Mrs. Mally, not sell or lease land or facilities to other restaurants within a radius of two miles. Therefore, because the lease of November 13, 1969, did not cover the entire transaction, the covenant in the lease should not control and supercede the broader covenant in the prior agreement, which does cover the entire transaction. Thus, merger is

[1] We note that where the object of a restraint of competition is to protect the vendee and the goodwill of the business sold, restrictive agreements are upheld. MCLA 445.766; MSA 28.66. *See Nowicki v Podgorski,* 359 Mich 18; 101 NW2d 371 (1960).

not applicable here and defendants Mally are
bound by the covenant contained in the July 7,
1969 agreement.[2]

Secondly, we must decide, given that defendants
Mally were bound by the restrictive covenant of
July 7, 1969, on the use of their land, whether
plaintiff had a proper action to enjoin defendants
from violation of that covenant. We believe they
did.

In Michigan, if the vendee has knowledge of the
restrictive agreement, the covenantee may enforce
the agreement against the vendee. In *Sun Oil Co v
Trent Auto Wash, Inc,* 379 Mich 182; 150 NW2d
818 (1967), the vendor conveyed property to Sun
and agreed not to use the adjacent land for a
gasoline service station. Later, the vendor deeded
the adjacent parcel to Trent, the vendee having
knowledge of the covenant at the time of the deed.
The Supreme Court held that a court in equity
could enjoin the vendor and those in privity with
her and on notice from violating the agreement.
Enforcement did not depend on the doctrine of the
running of a covenant with the land. In the case
at bar, since the notice of *lis pendens* gave the
vendee prior knowledge of the restrictive agree-
ment, plaintiff could enforce its restriction against
Swissdale if the partnership had title to the re-
strictive property. Some difficulty appears, though,
given that the Mallys' land sale agreement with
Swissdale had not yet been consummated.

No decision strictly on point exists in Michigan.

---

[2] This argument assumes the parties to the two agreements were
essentially identical. For the doctrine of merger to operate, the two
obligations must be between the same parties and upon the same
claim. 15 Williston on Contracts (3d ed), § 1875, pp 640–641. However,
since Mr. and Mrs. Mally were not parties to the second lease,
technically we might construe the parties to the two agreements as
entirely separate, which would also prevent defendants Mally from
being relieved by the doctrine of merger.

However, we do find authority with which we agree in the Ohio courts. *Highlandview Nursing Homes, Inc v Totalcare, Inc,* 36 Ohio App 2d 151; 303 NE2d 900 (1973). In *Highlandview,* the court held that the vendee had notice of the restrictive covenant if the vendee received notice after signing a land sale agreement but before actual conveyance. In the case at bar, there is no doubt that Swissdale is actually aware of the restrictive covenant. The Ohio court also held that actual notice o the vendee prior to the time of conveyance must also be ascribed to the vendor, because the vendor is in a position to deliver a deed free and clear of restrictive covenants. The Mallys have never been in a position to tender a deed without restrictions. Chester Mally claims that he was never aware of the intended use of the vendee, nor did he inform his realtor, Thompson-Brown, of the restrictive agreement. Even were this claim accepted, we still could not countenance this kind of business practice.

In *Highlandview,* the court reasoned that where both vendor and vendee are pursuing a common goal, they are both required to be cognizant of their obligations. Chester Mally was always aware of the covenant. At the time of his land sale agreement with Interstate Realty, he was currently being sued on that restrictive covenant. The trial judge essentially held that Chester Mally had no duty to inform the prospective vendee of the restrictive covenant and inquire whether the vendee was affected. If the injunction is not enforceable against the Mallys, then they are free to sell restricted property to uninformed buyers. This form of deception is unacceptable practice. An injunction will not force the Mallys to police the restrictive covenant; it merely forces them to be

honest in their dealings with other business people. We do not find this proposition burdensome.

Reversed and remanded for proceedings in conformity with this opinion.