RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PERFORMANCE CONTRACTING INC.,

        *Plaintiff-Appellant,*

  *v.*

DYNASTEEL CORPORATION; JAMES W. RUSSELL, JR.;
RONALD W. RUSSELL,

        *Defendants-Appellees.*

No. 13-1364

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City
No. 1:12-cv-10165—Thomas L. Ludington, District Judge.

Argued: December 3, 2013

Decided and Filed: April 28, 2014

Before: SILER, McKEAGUE, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Matthew T. Jane, BODMAN, PLC, Ann Arbor, Michigan, for Appellant. Stuart H. Teger, HONIGMAN, MILLER, SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellees. **ON BRIEF:** Matthew T. Jane, BODMAN, PLC, Ann Arbor, Michigan, for Appellant. Stuart H. Teger, HONIGMAN, MILLER, SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellees.

     McKEAGUE, J., delivered the opinion of the court, in which SILER, J. joined, and WHITE, J., joined in part. WHITE, J. (pp. 14–16), delivered a separate opinion concurring in part.

---

**OPINION**

---

McKEAGUE, Circuit Judge.    This case arises out of a dispute between a general contractor and a subcontractor over payment for services rendered.  The case presents questions concerning the interpretation and application of the Michigan Building Contract Fund Act, commonly referred to as the Michigan Builder's Trust Fund Act ("Trust Fund Act").  The district court ruled that the facts underlying this case did not trigger application of the Trust Fund Act, and granted summary judgment to the general contractor.  For the reasons discussed below, we affirm.

I.

This case concerns the interplay between three parties: a general contractor, the owner of a power plant, and a subcontractor.  The general contractor—and a defendant in this case—is DynaSteel, a company that had operations in Tennessee and Mississippi.  DynaSteel manufactured ductwork for power plants for nearly forty years, but in 2012, the company dissolved and liquidated its assets.  DynaSteel's Chief Executive Officer, James Russell, Jr., and its Chief Financial Officer, Ronald Russell, are the other defendants to this case.  Both Russells live in Tennessee.

Consumers Energy owned a power plant in Essexville, Michigan.  On September 30, 2008, Consumers Energy and DynaSteel entered into a Purchase Order contract concerning the Michigan plant, known as the Karn Project.  Under the Purchase Order, DynaSteel would—at its facilities in Mississippi and Tennessee—furnish, fabricate, and assemble ductwork for the Karn Project, and then complete all packaging, storage, handling, and shipping necessary to send the ductwork to the Michigan plant for installation, which would be completed by a third party.  The Purchase Order contained a Michigan choice-of-law provision.  Consumers Energy later issued a Project Change Notice to DynaSteel, which requested additional labor on the ductwork.  The Project Change Notice contained no choice-of-law provision.  Pursuant to the Purchase Order

and the Project Change Notice, Consumers Energy would pay DynaSteel $10,634,755 for the Karn Project.

The subcontractor—and plaintiff in this case—is Performance Contracting, Inc. ("PCI"), a company with headquarters in Kansas and an office in Tennessee. PCI and DynaSteel had a longstanding relationship, having worked on a project in Ohio (the Sammis Project) as well as another project in Maryland (the Brandon Shores Project) together. On February 28, 2009, DynaSteel issued a Purchase Order Agreement requesting that PCI supply the insulation requested by Consumers Energy for $1,842,890. This Purchase Order Agreement, which was both issued by DynaSteel and signed by PCI in Tennessee, contained a Tennessee choice-of-law provision.

As the Karn Project progressed, Consumers Energy paid DynaSteel over $2.9 million for DynaSteel's work, but DynaSteel did not reimburse PCI for PCI's work, owing PCI $1,542,890. DynaSteel had also not reimbursed PCI for PCI's work done on the Sammis Project, owing PCI $2,587,079, and the Brandon Shores Projects, owing PCI $749,675. Instead of paying PCI the remaining money it owed or segregating the funds into a separate trust, DynaSteel placed the funds it received from Consumers Energy into a general account in which DynaSteel allegedly comingled it with funds from other projects.

DynaSteel and PCI tried to resolve their differences over the unpaid monies from the Karn, Sammis, and Brandon Shores Projects during several meetings in Tennessee and in Kansas. On November 17, 2009, the parties executed a Payment Plan Proposal that addressed all three projects. The Payment Plan Proposal required DynaSteel to make periodic payments, which would apply to the unpaid projects in chronological order—meaning that monies paid by DynaSteel would first apply to the balances on the Sammis and Brandon Shores Projects, and then after those projects were paid in full, then to the balance outstanding for the Karn Project. The Payment Plan Proposal did not contain a choice-of-law provision. Between November 2009 and June 2010, pursuant to the Payment Plan Proposal, DynaSteel made payments to PCI totaling over $2.1 million. The payments fulfilled DynaSteel's financial obligations as to the Sammis and Brandon Shores Projects, but did not fulfill its financial obligation as to the Karn Project, with a balance of approximately two million dollars still outstanding.

The unpaid balance led to this current action.  On December 14, 2011, PCI filed suit against DynaSteel in the State of Michigan's Bay County Circuit Court.  PCI alleged, among other claims, that DynaSteel violated the Trust Fund Act.  On January 13, 2012, DynaSteel removed the case on diversity grounds to the U.S. District Court for the Eastern District of Michigan.  Both parties moved for summary judgment on the issue of whether the Trust Fund Act applied to their dispute.

In ruling on the two motions for summary judgment, the district court reached three conclusions.  First, the district court held that the original Purchase Order between PCI and DynaSteel—and not the subsequent Payment Plan Proposal—was controlling, meaning that the Tennessee choice-of-law provision in the Purchase Order remained binding on the parties.  Second, the district court held that the Tennessee choice-of-law provision applied to the breach of contract for which PCI sued DynaSteel.  Third, the district court ruled that the Trust Fund Act did not apply extraterritorially by its own force—meaning outside of the scope of or independent of the parties' contract—to this case because in enacting the Trust Fund Act, the "Michigan legislature must have intended some connection to the state" and because PCI and DynaSteel's "only connection to Michigan [was] the location of [Consumers Energy,] the owner that paid DynaSteel."  Dist. Ct. Opn. at 12–13, PageID # 1581–82.  The district court then granted summary judgment to DynaSteel.  This appeal followed.

II.

This court reviews a district court's grant of summary judgment *de novo*.  *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).  A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In analyzing a motion for summary judgment, we construe all evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Questions of statutory interpretation are questions of law that are also reviewed *de novo*.  *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011).  Under Michigan law, statutory interpretation requires an examination of the plain language of the statute.  *See In re Certified Question*, 659 N.W.2d 597 (Mich. 2003) (citations and internal quotation marks omitted) ("A fundamental principle of

statutory construction is that a clear and unambiguous statute leaves no room for judicial construction or interpretation.").

A threshold question to be decided is what law governs this case. The district court's choice-of-law determination is reviewed *de novo*. *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002). Under the well-established Supreme Court precedent in *Erie R.R. v. Tompkins*, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. 64, 78 (1938). Accordingly, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 417 (1996). When a conflict of law arises during such an action, "the choice-of-law rules of the forum state" govern. *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). Put differently, to resolve conflicts between state laws, a federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Accordingly, the choice-of-law rules to be applied are those of the State of Michigan.

III.

At the heart of this case is the Trust Fund Act, which was passed by the Michigan State Legislature in 1931 "to protect the people of the state from imposition and fraud in the building construction industry and to provide penalties for the violation of this act." Pmbl. to Mich. Comp. Laws §§ 570.151–153. The Trust Fund Act consists of only three relatively brief sections, reproduced in full below:

> **570.151 Building contract fund; status as trust fund**
> Sec. 1. In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.
>
> **570.152 Building contract fund; fraudulent retention or use by contractor or subcontractor of payments; penalties**
> Sec. 2. Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, for any other purpose than to first pay

laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court.

**570.153 Fraudulent retention or use by contractor or subcontractor of payments; evidence**
Sec. 3. The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

Mich. Comp. Laws §§ 570.151–153.

Both the legislative history and the case law interpreting the Trust Fund Act provide little guidance on how to interpret the act. One court described the legislative history as "obscure" and noted that the circumstances of the Trust Fund Act's enactment are unknown. *Gen. Ins. Co. of Am. v. Lamar Corp.*, 482 F.2d 856, 860 (6th Cir. 1973). Moreover, the case law interpreting the purpose of the Trust Fund Act is sparse. The *Lamar* court, which has provided perhaps the most thorough explanation of the Trust Fund Act, noted the following:

> During the boom period of the 1920's, speculative builders often undertook to construct projects too large for their available capital to finance, and they frequently paid suppliers and materialmen on older projects with funds received as payment on more current operations. With the advent of the crash of 1929 and the consequent widespread insolvency of many building contractors, these pyramided empires also collapsed and many subcontractors and suppliers were never paid. Subcontractors and materialmen on private projects were left only with mechanics' liens as remedies, and these were often ineffective. On the other hand, suppliers of labor and material on public projects were protected by statutorily required payment and performance bonds.

*Id.*

## IV.

This case presents three issues relating to the interpretation of the Trust Fund Act. First, the parties disagree whether the obligations imposed by the Trust Fund Act are tethered to a contract or whether they apply by their own force, meaning independent of any contract.

Second, assuming the Trust Fund Act applies by its own force, the parties disagree whether the Trust Fund Act applies extraterritorially. PCI argues for a wide-ranging "any beneficiary" interpretation. DynaSteel argues for a "sufficient contacts" interpretation, which would require a nexus between the parties and the State of Michigan. Third, assuming that the Trust Fund Act contemplates sufficient contacts between the parties and the State of Michigan, the parties disagree whether the Trust Fund Act applies to the facts of this case. We address each question in turn.

## A.

The first issue concerns whether the Trust Fund Act must be tethered to a contract or whether it may ever apply by its own force extraterritorially—with respect to out-of-state projects, parties, or mishandled funds—and irrespective of a contract. This is important to DynaSteel, of course, in light of the Tennessee choice-of-law provision in the Purchase Order between DynaSteel and PCI. To support its position that the Trust Fund Act requires a contract, DynaSteel points to the Trust Fund Act's language concerning liability "under the terms of the contract[.]" Mich. Comp. Laws § 570.152. DynaSteel also argues that if no monies are due under the parties' contract, a plaintiff has no claim under the Trust Fund Act. To support its contention that no monies on the Karn Project are owed to PCI, DynaSteel suggests that the monies paid by DynaSteel pursuant to the Payment Plan Proposal could have been directed to the Karn Project rather than the Sammis or Brandon Shores projects, which would have discharged DynaSteel's financial obligation arising out of Michigan-based construction projects.

We agree with PCI that the Trust Fund Act may apply by its own force and irrespective of a contract under certain circumstances. PCI correctly notes that, although the Trust Fund Act discusses penalties in conjunction with a contract, it does not require a contract for its application. *See* Mich. Comp. Laws §§ 570.151–53. Moreover, while the case law interpreting the Trust Fund Act often discusses the existence of a contract in an effort to flesh out the facts of a case, the case law clearly favors PCI's interpretation that the Trust Fund Act may apply by its own force. *See, e.g.*, *Accu-Tech Corp. v. Jackson*, 352 F. Supp. 2d 831, 834 (E.D. Mich. 2005) ("The [Trust Fund Act] could apply to the materials Accu–Tech sent Clover through two avenues. First, the parties may have incorporated the requirements into their contract. Also, the

[Trust Fund Act] may apply by its own force."); *DiPonio Const. Co., Inc. v. Rosati Masonry Co., Inc.*, 631 N.W.2d 59, 64 (Mich. Ct. App. 2001) ("Therefore, it is clear that a contractor or subcontractor may remain in compliance with the terms of its construction contracts while simultaneously violating the builders' trust fund act. Because the civil cause of action under the statute does not sound in breach of contract . . . ."). We conclude that the Trust Fund Act may apply by its own force under certain circumstances.

### B.

The second issue concerns whether the Trust Fund Act applies by its own force extraterritorially, and if so, what standard a plaintiff has to meet in order to trigger application of the Trust Fund Act to parties or transactions occurring outside of Michigan. The parties offer distinct interpretations. PCI's interpretation of the Trust Fund Act's extraterritorial applicability is wide-ranging, and focused on the notion that "any beneficiary" to a trust fund payment could bring suit under the Trust Fund Act. DynaSteel argues for a "sufficient contacts" interpretation, which would require a nexus between the parties and the State of Michigan as a precondition to bringing suit under the Trust Fund Act.

PCI advances two basic arguments to support its interpretation of the Trust Fund Act. First, as to statutory interpretation, PCI argues that the Trust Fund Act provides that the payment of funds by "any person" to a "contractor or subcontractor" is considered to be a "trust fund" for the "benefit of the person making the payment, contractors, laborers, subcontractors or materialmen." Mich. Comp. Laws § 570.151. Therefore, according to PCI, PCI may bring suit under the Trust Fund Act on the sole basis that PCI was a beneficiary of the payments between Consumers Energy and DynaSteel. This argument is not without merit, however we note that PCI does not address the preamble of the Trust Fund Act, which clearly states that its purpose is "to protect the people of the state" of Michigan. Pmbl. to Mich. Comp. Laws §§ 570.151–153.

Second, as to case authority supporting its interpretation, PCI relies on *DiPonio Construction Co. v. Rosati Masonry Co.*, a case which instructs that the Trust Fund Act should be "construed liberally for advancement of the remedy." 631 N.W.2d at 63. In particular, PCI focuses on *DiPonio*'s discussion of the prima facie elements of the civil cause of action available

under the Trust Fund Act.  *See id.* at 62–63.  The *DiPonio* court listed "the prima facie elements of a civil cause of action" under the Trust Fund Act as follows:

> (1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project.

*Id.* at 62.  Because the *DiPonio* language is not explicitly conditioned or restrained by location, PCI argues that its case falls within the bounds of the *DiPonio* standard, which, when viewed in isolation, might suggest that a cause of action brought by any out-of-state actor against any other out-of-state actor under almost any circumstances is available under the Trust Fund Act.  *See id. DiPonio*, however, did not discuss out-of-state actors in any way, as the case was instead focused on the statute of limitations period.  *See id.* at 63–67 (failing to note the citizenship of the parties to the case).  In other words, there is no basis to conclude that extraterritorial application of the Trust Fund Act was at issue in *DiPonio*.  *See id.*

We instead agree with DynaSteel's interpretation that the purpose and structure of the Trust Fund Act contemplates the need for sufficient contacts between the parties' conduct and the State of Michigan.  While the language of the Trust Fund Act is concededly open-ended, the preamble clearly states that the purpose of the Trust Fund Act is to protect the people of the State of Michigan.  *See* Pmbl. to Mich. Comp. Laws §§ 570.151–153.  As the legislative history provides little guidance, we look to the case law interpreting the Trust Fund Act to help inform our analysis.  *See Lamar Corp.*, 482 F.2d at 860.

In *Accu-Tech Corp. v. Jackson*, the court found that the Trust Fund Act applied to a Georgia corporation that was operating in Michigan.  352 F. Supp. 2d at 836.  *Accu-Tech* discussed *DiPonio*'s summary of a prima facie case under the Trust Fund Act—relied on heavily by PCI—as follows: "No element in plaintiff's prima facie civil claim explicitly requires an event or party to be affiliated with Michigan. . . . Clearly, however, the Trust Fund Act does not (and could not) reach this far.  The Michigan legislature must have intended some connection to the state."  *Id.* at 837.  The court found sufficient contacts to Michigan existed where "only two things [in the case were] not associated with the state" and where the plaintiff was "operating in

Michigan[.]" *Id.* *Accu-Tech* thus stands for the proposition that the Trust Fund Act requires sufficient contacts between the parties and the State of Michigan. *See id.*

We find this proposition wholly consistent with the Trust Fund Act. The Trust Fund Act's stated purpose was to "protect the people of state [of Michigan] from imposition and fraud in the building construction industry[,]" and relying on a sufficient contacts test in cases of extraterritorial application fulfills that purpose. *See* Pmbl. to Mich. Comp. Laws §§ 570.151–153. Furthermore, all of the case law interpreting the Trust Fund Act favors DynaSteel's sufficient contacts interpretation. In *In re Cousino*, the court ruled that a debtor had sufficient contacts with the State of Michigan and could be reached by the Trust Fund Act with respect to Michigan-based construction projects but not Ohio-based construction projects, because for the latter projects, the debtor's sole connection to Michigan was his purchase of supplies. 364 B.R. 289, 294 (N.D. Ohio 2006). In *Perini/Tompkins Joint Venture v. Comerica Bank*, a plaintiff satisfied the sufficient contacts test concerning a Maryland-based project because the "misappropriation of contract funds [occurred] in Michigan" and the company for which the plaintiff's judgment creditors brought the action was a Michigan-based company. No. 12-10234, 2012 WL 4009101, at *1, *3 (E.D. Mich. Sept. 12, 2012).

We therefore find that the Trust Fund Act's language in light of the legislature's express purpose as well as all of the case law refutes PCI's open-ended interpretation. Instead, the language, purpose, and case law all support DynaSteel's interpretation. We conclude that the Trust Fund Act requires sufficient contacts to the State of Michigan when it applies by its own force extraterritorially.

## C.

The third issue concerns whether the Trust Fund Act applies extraterritorially by its own force to the facts of this case. This dispute involves an out-of-state general contractor and an out-of-state subcontractor, where the parties remained at all times out-of-state in connection with the project, their contracts were executed out-of-state, their choice of law was out-of-state, the work was completed out-of-state, the funds were mishandled out-of-state, the payment plan was negotiated out-of-state, and the payment plan was executed out-of-state, but the work product was eventually shipped to Michigan, where it was installed by a third party. We hold that the

unique combination of facts of this case, when viewed as a whole, does not establish that the parties had sufficient contacts to the State of Michigan, and so the Trust Fund Act does not apply.

PCI emphasizes the Purchase Order between DynaSteel and Consumers Energy, which included a Michigan choice-of-law provision, to support its claim that sufficient contacts with the State of Michigan were established. But in so doing, PCI neglects its own Purchase Order Agreement with DynaSteel, which included a Tennessee choice-of-law provision. PCI argues that the Tennessee choice-of-law provision does not pertain in any way to its Trust Fund Act claims. PCI suggests that the parties' Payment Plan Proposal, which contained no choice-of-law provision, supersedes the parties' original Purchase Order, which contained a Tennessee choice-of-law provision. Accordingly, PCI would assert that the Tennessee choice-of-law provision should play no role in our sufficient contacts analysis.

We disagree. When parties enter into a subsequent agreement completely covering the same subject matter, but containing inconsistent terms, then the effect is to supersede and rescind the earlier contract. *See Lawyers Title Ins. Corp. v. First Federal Sav. Bank & Trust*, 744 F. Supp. 778, 783 (E.D. Mich. 1990)). But if the subsequent agreement does not completely cover the same subject matter, then the provisions in the original agreement still control (absent a distinct provision such as a merger clause). *See Nib Foods, Inc. v. Mally*, 246 N.W.2d 317, 321 (Mich. Ct. App. 1976). We agree with the district court's reasoning of why the Tennessee choice-of-law provision is valid:

> Here, the parties' first agreement—the March 19, 2009 Purchase Order—contained 14 distinct provisions, including a "Price and Payment" provision and a "Governing Law and Jurisdiction" provision. The parties' second agreement—the November 17, 2009 Payment [Plan Proposal]—involved only the payment of debts DynaSteel owed to PCI. It does not contain any terms that are inconsistent with the Purchase Order's choice-of-law provision, nor does it address the law to be applied to any disputes. Pursuant to the guidance of *Nib Foods*, the November Payment [Plan Proposal] only supersedes paragraph 2 of the Purchase Order: the provision for Price and Payment. Accordingly, . . . the original Purchase Order's choice-of-law provision will remain binding[.][1]

---

[1]Section 187(2) of the Restatement (Second) of Conflict of Laws is what Michigan follows to guide determinations of whether choice-of-law provisions in contractual arrangements are valid. *See* Restatement

Dist. Ct. Opn. at 7–8, PageID # 1576–77.   Therefore the choice-of-law provision governs the parties and, when viewed together with all of the facts in the case, counsels against finding sufficient contacts between the parties' conduct and the State of Michigan.

We stress that the choice-of-law provision, however, is not the only factor relevant to the sufficient contacts analysis.   Importantly, the alleged comingling of funds, the activity held by some courts to be most instructive on whether parties have sufficient contacts to the State of Michigan, occurred exclusively out-of-state.   *See Accu-Tech*, 352 F. Supp. 2d at 837 ("[T]he focal point of the [Trust Fund Act] is the mishandling of construction funds.   Indeed, this is the behavior the Trust Fund Act specifically makes unlawful.").   Other factors also counsel in favor of finding that the sufficient contacts test is not satisfied.   Notably, both PCI and DynaSteel are out-of-state parties.   The relationship between PCI and DynaSteel was forged exclusively in Kansas, Tennessee, and Mississippi.   PCI can point to no case applying the Trust Fund Act to two out-of-state parties.   *See, e.g., Perini/Tompkins*, 2012 WL 4009101, at *1–*3 (plaintiffs were judgment creditors of a Michigan-based company); *Accu-Tech*, 352 F. Supp. 2d at 832–33 (defendants were Michigan companies); *Cousino*, 364 B.R. at 291 (plaintiff was based in Michigan); *see also DiPonio*, 631 N.W.2d at 62–67 (providing no indication that the parties were out-of-state).

We assume, without deciding, that it is conceivable that certain circumstances involving two out-of-state parties could satisfy the sufficient contacts test and trigger application of the Trust Fund Act.   However, we find that no such circumstances exist here.   Consumers Energy is a Michigan-based power-plant owner, and the plant is located in Michigan, but all of the other relevant acts in the case—except for the shipment of the goods by another third party—took place in a state other than Michigan.   Moreover, despite the fact that it has been in effect for over eighty years, the Trust Fund Act has never applied to two out-of-state parties that executed a contract in a different state that included an out-of-state choice-of-law provision, where none of the work or payment negotiations were completed in-state, where neither party entered the state,

---

(Second) of Conflict of Laws § 187(2)(b) (1988) (discussing greater material interests).  Applying that standard here, DynaSteel correctly argues that choice of law provisions such as this one are valid and enforceable in Michigan where, as here, DynaSteel's offices were in Tennessee, PCI has an office in Tennessee, the Purchase Order was issued and signed in Tennessee, and the individual defendants live in Tennessee.

and where the funds were handled in a different state. We conclude that this unique combination of facts does not establish sufficient contacts between these parties and the State of Michigan for the purpose of triggering the Trust Fund Act.

V.

We conclude that while the Trust Fund Act can apply by its own force extraterritorially, it requires sufficient contacts between the parties and the State of Michigan. We further conclude that the unique factual structure of this case does not establish sufficient contacts with the State of Michigan. For the reasons stated above, the district court's grant of summary judgment to DynaSteel is AFFIRMED.

---

**CONCURRING IN PART**

---

HELENE N. WHITE, Circuit Judge (concurring in part).  Because the contract between the litigating parties contains a choice-of-law provision that runs counter to the application of Michigan's Trust Fund Act, and Michigan courts would honor that choice of law under these circumstances, I agree that the Act does not apply.[1]  I write separately because I do not agree that there are insufficient contacts to support application of the Trust Fund Act, and were it not for the contractual choice-of-law provision, I would find that the Trust Fund Act applies.

I agree with the majority that application of the Trust Fund Act extraterritorially to impose a trust upon a payment that would otherwise come within the Act requires that there be certain minimum contacts with Michigan.[2]  But it cannot be seriously argued that DynaSteel has insufficient contacts with Michigan to be subject to suit under the Act.  DynaSteel's contract with Consumers to provide ductwork for the Michigan project expressly states that the purchase order shall be deemed a Michigan contract and subject to the laws of Michigan.  Although DynaSteel's contract with PCI has a different choice-of-law clause, this does not change the minimum-contacts analysis.  DynaSteel accepted money in payment for ductwork delivered to Michigan for installation on a Michigan job.  It certainly could expect to be subject to the Michigan Trust Fund Act.  Michigan has an interest in assuring that payments made by Michigan property owners go to the subcontractors whose goods and services are incorporated into Michigan projects.  It also has an interest in assuring that out-of-state suppliers are willing to render services and sell materials for Michigan products without fear that they have fewer protections than Michigan suppliers might have or than they may have in their home states.  In short, I cannot agree that an out-of-state subcontractor contracting with an out-of-state contractor

---

[1]I agree with the majority that the Purchase Order and the November Payment Plan Proposal must be construed together "as part of the total accord," under Nib Foods, Inc. v. Mally, 246 N.W.2d 317, 321 (Mich. Ct. App. 1976); and therefore the choice-of-law provision is part of the total agreement.

[2]It is unclear whether the majority comes to this conclusion based on a constitutional/minimum-contacts analysis, or as a matter of statutory interpretation of the Act.

to supply product for incorporation into a Michigan project has insufficient contacts with Michigan to invoke the Trust Fund Act in relation to the contractor and the project.

That the Trust Fund Act might be properly invoked in such a situation does not, however, preclude a non-Michigan contractor and non-Michigan subcontractor from agreeing that their contract and their performance thereunder will be governed by the case and statutory law of another state. A subcontractor that enters into such a contract forgoes the protection of the Michigan Trust Fund Act unless Michigan has a strong interest in its application.

Under Michigan law, "parties may, in general, agree [in a choice-of-law provision] that all causes of action pertaining to a particular matter will be ... subject to the law of a particular jurisdiction." *Offerdahl v. Silverstein*, 569 N.W.2d 834, 835 (Mich. Ct. App. 1997). "[I]t is undisputed that Michigan's public policy favors the enforcement of contractual . . . choice-of-law provisions." *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). However, when parties agree to a choice-of-law provision and there is a conflict-of-law dispute, "the approach set forth in the Restatement (Second) of Conflict of Laws" applies. *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738 (6th Cir. 1999); *see also Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993) ("Michigan has adopted the approach articulated in 1 Restatement (Second) of Conflict of Laws § 187."); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995).

> In pertinent part, Section 187(2) of the Restatement states:
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> Restatement (Second) of Conflict of Laws § 187(2) (2013).

As the majority notes in n. 1, Michigan courts would enforce the choice of law provision. Tennessee has a substantial relationship to the parties or transaction -- DynaSteel's principal place of business is in Tennessee, PCI has an office in Tennessee, and the Purchase Order was issued and signed in Tennessee. The next question is whether Michigan has a materially greater interest than Tennessee sufficient to ignore the parties' choice of Tennessee law. In *Skyline*, the Michigan Supreme Court addressed a contractual choice-of-law provision declaring Michigan law applicable to a project performed in Illinois:

> In determining that Illinois had a materially greater interest, the Court of Appeals focused mostly on the "place of performance" factor of § 188. As the place of performance of the construction work, Illinois has a strong interest in ensuring that the parties conform to its laws. Thus, the Court of Appeals correctly noted that Illinois would have great interest in deterring specific construction practices; however, the question is whether Illinois has a *materially greater* interest than Michigan sufficient to ignore the parties' choice of Michigan law. It is questionable whether Illinois has a greater interest in reaching into the contractual arrangements of out-of-state companies when those companies have negotiated an agreement in their own state concerning the relative liability obligations between them.

*Skyline*, 528 N.W.2d at 704. This is a strong indication that Michigan courts would honor the parties' choice of Tennessee law.

The majority correctly holds that the Trust Fund Act operates without regard to contractual provisions. There can be a breach of the Act without a breach of contract other than nonpayment. And, the Trust Fund Act applies even where the contract does not so provide. It is a separate question, however, whether Michigan law applies in a given situation. If it does apply, the Trust Fund Act operates separate and apart from the parties' contract. But if the Act does not apply because of a valid choice-of-law provision, then the scope of its application is irrelevant.

In sum, I agree that the Trust Fund Act does not apply. I come to this conclusion because DynaSteel and PCI agreed that Tennessee case and statutory law would govern their performance under the contract. I do not agree that there are insufficient contacts to support application of the Trust Fund Act; were it not for the choice-of-law provision, I would apply the Act.