Michael K. CHAPMAN, Next of Kin and an Heir and Administrator of the Estate of Olivia S. Chapman, Deceased, and Henry T. Chapman, Individually and as Wrongful Death Beneficiary of Olivia S. Chapman, Deceased, Plaintiffs,

v.

SAFECO INSURANCE COMPANY OF AMERICA, Defendant.

No. DC87-107-S-O.

United States District Court, N.D. Mississippi, Delta Division.

Sept. 1, 1989.

John H. Cocke, Merkel & Cocke, Clarksdale, Miss., Allen B. Couch, Couch & Travis, Southaven, Miss., for plaintiffs.

K.R. Shuttleworth, Shuttleworth, Smith & Webb, Memphis, Tenn., for defendant.

## OPINION

SENTER, Chief Judge.

This case involving a claim of bad faith refusal to pay an insurance claim is before the court for consideration of the defendant's motion for summary judgment and the plaintiffs' cross-motion for summary judgment.

## I. FACTS

The undisputed facts are as follows: On February 5, 1986, Olivia Chapman was a passenger in an automobile which her husband, Henry Chapman, was driving along Pleasant Hill Road in Shelby County, Tennessee. The Chapman's car was struck on the passenger's side by a car driven by Joann Fowler. Mr. and Mrs. Chapman were taken by ambulance to Methodist South Hospital where Mrs. Chapman was pronounced dead on arrival. The police report filed concerning this accident shows that the accident resulted from Ms. Fowler's failure to yield the right of way at a four-way stop at the intersection of Pleasant Hill Road and Holmes Road. The report also contains the statement that Mr. Chapman's car was already in the intersection when Ms. Fowler ran the stop sign and that no action taken by Mr. Chapman was a contributing factor in the accident.

On February 28, 1986, just over three weeks after the accident, Mr. Chapman and his son, Michael, acting as administrator of Olivia Chapman's estate, filed suit in the United States District Court for the Western District of Tennessee against Joann Fowler. Pursuant to Tennessee statute,[1]

---

1. The Tennessee statute, Tenn.Code Ann. § 56–7–1206(a), is one of a series of code sections dealing with uninsured motorist protection. It provides: "Any insured intending to rely on the coverage required by this part shall, if any action is instituted against the owner and operator of an uninsured motor vehicle, serve a copy of the process upon the insurance compa-

Safeco, the Chapman's uninsured motorist coverage carrier, was given notice of the pending suit. Safeco entered the lawsuit as a defendant and filed an answer in which it alleged that Henry Chapman was negligent in that he failed to keep a proper lookout; failed to keep his vehicle under control; was driving at a reckless rate of speed; and "was not sufficiently aware or mentally alert to operate an automobile."

After conducting discovery, Safeco filed a motion for leave to amend its answer to include the defense of material misrepresentation. Sometime after this motion was granted, the Tennessee suit was withdrawn on a stipulation of dismissal under Fed.R. Civ.P. 41(a). In September, 1987, the instant suit was filed. Safeco still contends that Mr. Chapman's own negligence was at least a contributing cause of the accident and that it is entitled to rescind the policy due to misrepresentations made by Mrs. Chapman in answer to questions asked on the insurance application form.

## II. DISCUSSION

### A. Safeco's Summary Judgment Motion

#### 1. Misrepresentations

■ Safeco contends that it is entitled to summary judgment on its misrepresentation defense. The company alleges that the Chapmans misrepresented or concealed three facts which they should have divulged in answer to questions on the application form. When Mrs. Chapman was asked whether any company had ever declined to issue or renew an auto insurance policy covering the Chapmans, she told the agent asking the questions that none had. Safeco's argument that this was a misrepresentation is based on the fact that Commercial Union Insurance Co., the Chapman's previous auto insurance carrier, had declined to renew the Chapman's policy.

However, the reason for this nonrenewal is a subject of genuine dispute. Safeco relies on a document sent by Commercial Union to its local agent, Cleo Smith, in which Commercial Union proposed nonrenewal as of November 23, 1985, due to four minor losses and asked for Ms. Smith's input on whether nonrenewal was appropriate in this case. This letter was dated September 30, 1985. According to Ms. Smith, prior to her receipt of this letter, she and the Chapmans had discussed the fact that Commercial Union would not continue to insure them once they moved to Mississippi and that they would have to get auto insurance through another company that was doing business in Mississippi. Ms. Smith also stated at her deposition that it was her opinion based on prior dealings with Commercial Union that the company would have renewed the policy if her agency had asked them to do so, but that she had not responded to the September letter because she and the Chapmans had already discussed moving their coverage to Mississippi. Thus, fact questions [2] are apparent in relation to the question whether Safeco is entitled to rescind its policy based on this alleged misrepresentation. First, it is unclear whether this letter constitutes an actual notice of nonrenewal or is merely a statement of a proposed course of action from the company to its local agent. In any event, it appears that this particular letter was not sent to the Chapmans. Secondly, it is unclear whether the Commercial Union policy was terminated because of excessive losses or because the Chapmans had moved out of Tennessee. If the latter is the case, then the issue is whether Mrs. Chapman's representation that no company had ever refused to renew a policy was a material misrepresentation. A misrepresentation of a fact that is not material to the risk being assumed by the insurance

ny issuing the policy in the manner prescribed by law, as though such insurance company were a party defendant; such company shall thereafter have the right to file pleadings and take other action allowable by law in the name of the owner and operator of the uninsured motor vehicle or in its own name; provided, however, that nothing in this subsection shall prevent such owner or operator from employing coun-

sel of his own choice; provided, further, that the evidence of service upon the insurance carrier shall not be made a part of the record."

**2.** These questions are entirely separate from the issue of waiver raised by the plaintiffs which is discussed infra.

company does not entitle the company to rescind the policy. Miss.Code Ann. § 83–9–11. "The materiality of a representation is determined by the probable and reasonable effect which truthful answers would have had on the insurer." *Sanford v. Federated Guaranty Insurance Co.*, 522 So.2d 214, 217 (Miss.1988). Extremely pertinent to this inquiry is the fact that the nonrenewal notice sent to the Chapmans gave no reason for the nonrenewal.

The existence of these fact questions makes summary judgment on this issue inappropriate.

■ The second statement on the application which Safeco contends was a material misrepresentation was made in answer to this question: "Does any driver have a physical impairment, including heart condition, diabetes, epilepsy, etc.?" Rex Haynes, the agent who sold the Chapmans the Safeco policy, stated at his deposition that he told Mrs. Chapman that this question required that she reveal only those physical conditions which would affect one's ability to drive.[3] Safeco contends that when Mrs. Chapman gave "no" as an answer to this question, she concealed from the company two facts which were material to the risk to be assumed by the company. First, the company contends that in response to this question, Mrs. Chapman should have revealed the fact that her husband had undergone a bilateral frontal lobotomy in 1956. However, at the time the company asserted this alleged misrepresentation as a basis for rescission, it knew that the lobotomy had been performed to correct a personality disorder. Safeco has yet to come forward with any evidence which would raise a jury question as to whether this was a *physical* impairment."[4]

At this point, it should be noted that the generally accepted rule is that any ambiguity in the question asked is construed in favor of the insured.

The same rule of construing an insurance policy or bond strongly against the insurer and favorably to the insured applies to an application, or matters contained therein, as to the policy itself, the instrument having been prepared by the insurer. The insurance company is also under a duty to frame questions in the application so that they will be free from misleading interpretations. When it has failed to do so, and ambiguity or doubt arises, questions and answers thereto will be construed most favorably to the insured.

13A Appleman, Insurance Law and Practice § 7585 (1976). This is the rule in Mississippi. *See Life & Casualty Ins. Co. of Tenn. v. Kelly*, 202 Miss. 319, 32 So.2d 120 (1947). Safeco's own personnel noted in an internal memo that the "somewhat obscure" wording of the physical impairments question was a problem for Safeco in relation to its claim that the failure to disclose Mr. Chapman's lobotomy was a misrepresentation.

More importantly, even if the plaintiff's problem was clearly a physical one, the defendant still would not be entitled to summary judgment because it has produced no evidence that this impairment affected Mr. Chapman's ability to drive.[5] In fact, an internal Safeco memo dated January 14, 1987, reveals that Safeco's attorneys had a radiologist review Mr. Chapman's medical records to see if the surgery performed would have impaired his driving ability. This radiologist, Dr. Westmoreland, informed Safeco that a frontal lobotomy would have no effect on the patient's motor skills.

---

**3.** Although there apparently is no dispute that Haynes qualified the question in this manner, it seems clear that only physical problems that would affect driving ability would be material to the risk being assumed by Safeco.

**4.** Dr. Howard Boone, Mr. Chapman's attending physician for over twenty years, stated at his deposition that this condition was "purely mental."

**5.** When an insurance company raises a defense of misrepresentation, the company bears the burden of proving by clear and convincing evidence that a material misrepresentation was made. *Gardner v. Wilkinson*, 643 F.2d 1135 (5th Cir.1981) (applying Mississippi law).

■ Safeco also contends that the answer to the physical impairment question concealed the fact that Mr. Chapman had suffered a disabling injury to his right leg in a work-related accident in 1970. The leg was fractured just above the ankle, resulting in impaired circulation in that leg according to Dr. Boone, Mr. Chapman's longtime personal physician. From the evidence presented by both parties, it is clear that Mr. Chapman had some continuing problems with this right leg. In 1976 he had to retire from his job as an electrician because he could no longer go up and down ladders or remain standing for long periods of time. Even after that, he had problems with ulcers on the leg due in part to poor circulation. Safeco's contention that the failure to report this condition on the application was a material misrepresentation is based on the answers given by two doctors to deposition questions that were so complex that a Ph.D. in English grammar could not diagram them.

During direct examination, Dr. Boone stated that Mr. Chapman's right leg was fine for "average ordinary use" and that it was his medical opinion that the injury did not impair his ability to drive. In an apparent attempt to offset this testimony on cross-examination, Safeco's attorney asked the following question:

Let me ask you also during that period of time if, knowing the problems he was having getting by, if Mrs. Chapman had not been there during those ten years—and you have indicated that would have probably made his situation worse—if he had come to you or some prospective employer had sent him to you to ask your opinion about whether or not he would qualify on a pre-employment physical for a job that required him to drive a car, would you have had any hesitancy in certifying him for that kind of a job based upon his mental condition and the residuals from the prefontal lobotomy?

Once it was made clear that the time frame was from 1976 forward, Dr. Boone gave this response:

I doubt that I would have. It's kind of hard to predict what you might do hypothetically, but I doubt that I would have

given a medical okay for him to do a job that required automobile operation.

A similar question was asked of Dr. Nancy Duckworth. That question took this form:

Knowing the history as you have described it here and based upon the conclusions and opinions that you have professionally drawn from that, also based upon your diagnosis that there had been predating this accident the onset of presenile dementia, if I, as a prospective employer of Mr. Chapman, had sent him to you for a pre-employment physical certification and part of the job description for him would have been the driving of an automobile, based on all of these problems that he had prior to his accident, would you have medically certified him to drive an automobile?

Dr. Duckworth's answer was, "I don't think I would have; but then I've always been a very conservative person ..."

The problem with each of these questions is that they ask the doctors to figure in Mr. Chapman's mental problems in deciding whether they would certify him as capable of doing a job that involved driving. This renders the responses wholly irrelevant to the issue at hand—whether Mrs. Chapman misrepresented when she said that neither she nor Mr. Chapman had any *physical* problems that would impair their driving abilities. It appears that Safeco misconceives the right to rescission based on misrepresentation. As this court has previously stated the point,

[an insurer] has no right to rescind the policy because there was information not asked for on the application and not volunteered by the applicant, the knowledge of which would have caused the company to refuse to insure.

*Mattox v. Western Fidelity Ins. Co.,* 694 F.Supp. 210, 216 (N.D.Miss.1988). Safeco cannot complain that it was not told of Mr. Chapman's mental condition when it did not ask about mental conditions; nor is it entitled to rescind the policy solely because it would not have issued the policy if it had known about this condition.

Because the defendant has presented no conclusive evidence that Mr. Chapman's leg condition alone was a physical impairment that affected his ability to drive, this issue is not ripe for summary judgment.

### 2. Bad Faith In the Uninsured Motorist Case

■ It appears that Safeco would have this court hold that in every uninsured motorist case the insurance company is entitled to deny the liability of the uninsured motorist and put its own insured to his proof on that point. Safeco argues that under Mississippi law, the insurance company is liable "to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle." Miss.Code Ann. § 83–11–101 (1972 & 1988 Supp.). A second premise in this argument is that "[t]here is no fiduciary duty of good faith and fair dealing between an insured and his insurance company in Mississippi in the context of a first-party insurance contract." *Harrison v. Benefit Trust Life Ins. Co.*, 656 F.Supp. 304 (N.D.Miss.1987). Safeco contends that it follows from these two propositions that an insurance company has a right to force its insured to prove the liability of the uninsured motorist even in the absence of any good reason for denying that liability.

It is difficult to follow the logic of this argument. Although Mississippi courts have not expressly held that a duty of good faith and fair dealing is implied in a first-party insurance contract, the Mississippi Supreme Court has long held that a breach of contract may be "attended by intentional wrong, insult, abuse, or such gross negligence as to consist of an independent tort." *Progressive Casualty Ins. Co. v. Keys*, 317 So.2d 396, 398 (Miss.1975). Punitive damages may be assessed against one who commits such a tort. *Id.* Just three years after *Keys*, the Supreme Court held that the refusal to pay a claim without an arguable reason could give rise to liability for

punitive damages.[6] *Standard Life Ins. Co. v. Veal*, 354 So.2d 239 (Miss.1978). With this case, Mississippi's law of "bad faith" was born. So, while it is true that Mississippi has not embraced the notion that there is implied in every insurance contract a duty of good faith, the breach of which would entitle the insured to punitive damages, there is clearly a duty under Mississippi tort law to avoid acting in bad faith. The point that Safeco fails to appreciate is that Mississippi has simply taken a different theoretical approach to resolving the problem of insurance companies denying claims without justification than other states have taken.

In fact, the Mississippi Supreme Court has addressed and rejected exactly the contention Safeco is making in this case. In *Employers Mutual Casualty Co. v. Tompkins*, 490 So.2d 897 (Miss.1987), the insurer argued that punitive damages are never appropriate in uninsured motorist coverage cases. The company relied upon several cases from other jurisdictions in support of this proposition. These cases were from jurisdictions where the basis for the assessment of punitive damages for breach of an insurance contract was the implied duty of good faith and fair dealing. The holding that punitive damages could not be assessed in an uninsured motorist coverage case was based on the preliminary holding that the duty of good faith was not implied in such a contract. The Mississippi Supreme Court found this argument entirely unpersuasive, holding that "these cases have little, if any, application to the familiar rule on punitive damages in this State." *Id.* at 906. The court further stated its opinion that:

> The uninsured motorist provision in question is nothing more than a contract to be enforced in accord with its terms and public policy. If a breach occurs as the result of an intentional wrong, insult, abuse, or such gross negligence that an independent tort arises therefrom, then,

---

**6.** A finding that the company acted without an arguable reason is not, of itself, sufficient to support an award of punitive damages. The finder of fact must also conclude that the action was taken with malice, gross indifference, or reckless disregard for the rights of the insured. *Pioneer Life Ins. Co. v. Moss*, 513 So.2d 927, 930 (Miss.1987).

in that event and only in that event, punitive damages may be awarded.

*Id.*

Thus, it is clear that the insurer does not have the right to deny coverage and force the plaintiff to go to court and prove the liability of the uninsured motorist where the company has no arguable reason for denying the liability of the uninsured motorist. Of course, if there is a legitimate dispute as to the amount due, the company does not act in bad faith by denying the claim and defending on that basis. *Stamps v. Estate of Watts*, 528 So.2d 812 (Miss.1988); *Progressive Casualty Ins. Co. v. Keys*, 317 So.2d 396 (Miss.1975).

The enunciation of the general rule from *Tompkins* does not resolve the issue as it arises in this case. The case before the court is a most unusual one in that the insurance company entered the lawsuit against the alleged tortfeasor before it ever denied coverage. In fact, Safeco probably had not had time to fully investigate the accident at the time it was served with a copy of the complaint against Ms. Fowler. Safeco contends that by serving his insurer with notice of the lawsuit against Fowler, Mr. Chapman placed his insurance company in an adversarial role and that everything that has happened since cannot be considered to be bad faith because it was simply litigation as usual. The obvious flaw in this argument is that the plaintiff merely did what was required by Tennessee law. The decision to enter the lawsuit was made by Safeco. Upon receipt of notice of the suit, Safeco had an array of options available to it, including undertaking the defense of the uninsured motorist, entering the lawsuit as a separate defendant whereupon it could either deny liability if it had a reasonable basis for so doing or admit liability and contest damages, or it could have done nothing at all with regard to the lawsuit and proceeded to conduct its own investigation of the Chapman claim.[7] The mere fact that the insurance company had a right under Tennessee law to enter the lawsuit did not relieve it of its duty under the law of Mississippi which governed the insurance contract to give its insured an honest answer to his claim.

Safeco also contends that the answer it filed in the Tennessee action should not be treated as a denial of the claim because it did not officially notify Mr. Chapman until May, 1987, that his claim would not be paid. This argument is specious. When Safeco chose to enter the Tennessee lawsuit and raise allegations of Mr. Chapman's contributory negligence as a defense—a defense which under Tennessee law[8] would be a complete bar to recovery against Ms. Fowler and, therefore, also against Safeco—Safeco notified Mr. Chapman in as effective a manner as can be imagined that it had no intention of paying his claim.

Summary judgment on this issue must be denied because as a matter of Mississippi law, punitive damages may be assessed against an insurer who denies coverage without an arguable reason and with reckless disregard for the rights of the insured.

**B. The Chapmans' Summary Judgment Motions**

**1. Waiver**

■ The plaintiffs raise several grounds on which they contend that they are entitled to summary judgment that Safeco is liable on the contract claims. The first of these which the court will address is the Chapmans' argument that Safeco waived any claim of misrepresentation when it renewed the Chapmans' auto coverage while in possession of information which it now claims entitles it to rescind the policy. It is clear that Safeco was fully informed of Mr. Chapman's lobotomy and was aware of his

---

7. Obviously, the latter course is rather risky given the fact that absent some contractual basis for denying the claim, the extent of the company's liability is determined by the amount of damages assessed against the uninsured motorist up to the policy limits.

8. It is not entirely clear that this court, being *Erie*-bound to apply Mississippi's choice of law rules, should apply Tennessee's contributory negligence law in view of the strong public policy considerations surrounding Mississippi's adoption of the comparative negligence standard. *See Boardman v. United Services Auto Association*, 470 So.2d 1024, 1038 (Miss.1985).

leg condition at least as early as April, 1986; yet they accepted renewal premiums and renewed Mr. Chapman's auto coverage on May 23, 1986, and again on November 23, 1986. Safeco contends that although it had the basic facts in April, 1986, it did not know whether either the leg condition or the frontal lobotomy diminished Mr. Chapman's driving ability until expert depositions were taken in May, 1987. Only after taking these depositions did Safeco terminate the policy and move to amend its answer to assert misrepresentation as a defense.

In Mississippi,

An insurer may waive the right to forfeit or rescind a policy of insurance when the elements of estoppel are not present by recognizing the validity of the policy and continuing it in force after knowledge of circumstances entitling it to avoid the policy.

*Casualty Reciprocal Exchange v. Wooley*, 217 So.2d 632, 636 (Miss.1969). However, "waiver is a voluntary and intentional relinquishment of a *known* right or conduct that warrants an inference of such a relinquishment." *Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398, 404 (5th Cir. 1988) (emphasis added). In this case, there is a fact dispute concerning how much Safeco knew at the crucial time. This dispute must be resolved by the jury after trial.

2. The Integration Clause

█ The Chapmans also contend that Safeco is barred from relying on the alleged misrepresentations in the application because the insurance policy contained the following integration or merger clause:

By acceptance of this policy the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

The plaintiffs rely on the case of *Harris v. State Farm Mutual Automobile Ins. Co.*, 232 F.2d 532 (6th Cir.1956), in support of

their argument that by inserting this clause in the contract, Safeco "foreclosed itself from relying on the statements in the application by its stipulation that the policy itself embodied all the agreements between the company and the insured." *Id.* at 537. Safeco asserts that the holding of *Harris* was expressly rejected by the Mississippi Supreme Court in *Casualty Reciprocal Exchange v. Wooley, infra.* However, rather than reject the holding of *Harris*, the *Wooley* court distinguished it, noting that *Harris* involved a purely innocent misrepresentation whereas *Wooley* involved five misrepresentations, each of which was knowingly made. The court in *Harris* had noted that the rule that it was adopting would not bar the company from raising fraudulent misrepresentation as a ground for rescission, so, in fact, *Wooley* is not even at odds with *Harris*.

Safeco has not contended, and certainly has produced no evidence that, the alleged misrepresentations in this case were made with the intent to defraud. Therefore, this court must decide whether Mississippi would follow *Harris* if presented with a case that could not be distinguished on its facts. The task before the court is one of interpretation of the contract. When presented this exact issue in a case involving an identical integration clause, Judge Dyer, writing for the majority of a panel of the Fifth Circuit said:

It seems clear to us that the clause simply designated what factual statements [the declarations] the insured was willing to agree should be treated as warranties and nothing more.... [T]he clause was never meant to reach out and obliterate the representations made in the application which formed the inducement to the insurer to issue its contract.

*State Farm Mutual Automobile Ins. Co. v. Lee*, 343 F.2d 55, 58 (5th Cir.1965). *Lee* involves the application of Florida law and despite the quoted language, does not expressly reject the reasoning of *Harris*. Instead, the court in *Lee* distinguished *Harris* on the same ground that the Mississippi Supreme Court did in *Wooley*. Thus, the quoted language is mere dicta. However,

this court is of the opinion that Judge Dyer's interpretation of the clause is the better one. The language quoted from the insurance policy is not ambiguous. By its plain terms, it says merely that the insured, by accepting the policy, adopts the statements on the declarations page as his own and recognizes that the company is relying on them; and that there are no other *agreements* between insured and insurer other than those set forth in the policy. There is nothing in this statement which even suggests that the company is waiving its right to rely on the representations made by the insured on the application. The obvious purpose of this clause is the same as that of an integration clause in any other contract. It is simply a statement that this is the final and entire agreement of the parties. Such clauses do not prevent either of the parties from proving facts which would justify rescission of the entire contract.

Although the court in Harris makes no reference to the parol evidence rule, that is clearly the theory on which the decision is based. The general statement of the parol evidence rule is:

> When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

3 Corbin On Contracts § 573 (1960). The clause at issue here is strong evidence that the parties intended the policy to be the full and final statement of their agreement so that evidence of any prior agreements or negotiations may not be admitted for the purpose of varying or contradicting the terms embodied in the policy. However, the parol evidence rule does not bar evidence that would tend to establish one party's right to avoid the entire agreement.

> Agreements and negotiations prior to or contemporaneous with the adoption of a writing *are* admissible in evidence to establish ... (d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause; [or] (e) *ground for granting or denying rescission,* reformation, specific performance, or other remedy.

Restatement (Second) of Contracts § 214 (1981) (emphasis added). Under Mississippi law, an innocent misrepresentation of a fact material to the risk being assumed is ground for granting rescission of an insurance contract. This court holds that the company is entitled to attempt to prove facts which would entitle it to the remedy of rescission even though the contract contains an integration or merger clause.

### 3. Mississippi's Cancellation Statute

The plaintiffs also argue that under Mississippi law, an automobile policy may not be voided by virtue of new information discovered by the insurer more than sixty days after the policy has become effective. This argument is based on Miss.Code Ann. § 83–11–3 which sets forth the allowed grounds for cancellation of an auto insurance policy and then provides that the section does not apply to policies which have been in effect less than sixty days as of the date notice of cancellation is mailed. This argument is without merit. The section expressly refers only to cancellations; it does not address the company's right to seek rescission as a remedy.

### 4. Is Safeco Bound by Its Original Reason for Denial?

Finally, the plaintiffs contend that Safeco is bound by its original reason for denying liability—Mr. Chapman's contributory negligence—and cannot rely upon the defense of misrepresentation first asserted some sixteen months after the claim was filed. Plaintiffs' counsel argues that the insurance company cannot be allowed to give one reason for denying liability and then go on an extended fishing expedition in hopes of finding firmer ground on which to make its stand. The plaintiffs find support for this position in the Mississippi cases.

> [A]n insurance company has a duty to the insured to make a reasonably prompt investigation of all relevant facts. It has a further duty, after an adequate investi-

gation and a realistic evaluation of the claim, to tell the insured, its customer, the plain truth. And, if the insurance company cannot give the insured a valid reason for denying the claim, it has a final duty to promptly honor it.

*Bankers Life and Casualty Co. v. Crenshaw,* 483 So.2d 254, 276 (Miss.1986).

The plaintiffs' argument may be taken in either of two ways. On the one hand, they may be contending that by denying coverage based on Mr. Chapman's contributory negligence with no evidence to support that claim, Safeco committed an act of bad faith which would expose it to liability for punitive damages even if the later-asserted misrepresentation defense was upheld at trial. This argument appears to run headlong into the rule that a plaintiff is not entitled to punitive damages for tortious breach of contract unless there is a "determination that the plaintiff is entitled to contractual damages." *State Farm Fire and Casualty Co. v. Simpson,* 477 So.2d 242, 254 (Miss.1985). However, that rule is an application to the breach of insurance contract situation of the more general rule that punitive damages may not be assessed when there is no proof of actual damages. *Mississippi Power Co. v. Jones,* 369 So.2d 1381, 1386 (Miss.1979). Read in this light, the rule cited from *Simpson* might not bar the plaintiff from recovering punitive damages for the initial bad faith denial, if the plaintiff could prove actual damages which were proximately caused by that breach.

█ Without reaching a conclusion as to the rule which the Mississippi courts might apply in a case where an initial denial of coverage, made without an arguable basis, was followed, after some delay, with a legitimate denial of coverage based on policy terms, this court is convinced that in this case, Safeco should not be subject to damages for tortious breach of contract based on the initial denial if at trial it is deter-

mined that Safeco is entitled to rescind the policy.[9] Under Mississippi law, a misrepresentation on the application which is material to the risk being assumed entitles the insurer "to have the policy cancelled *ab initio." Casualty Reciprocal Exchange v. Wooley,* 217 So.2d 632, 635 (Miss.1969). It would be anomalous indeed to punish Safeco for the tortious breach of a contract that is to be treated as if it had never existed.[10]

The second prong of the plaintiffs' argument on this point is that Safeco should be barred from relying on the second ground given for denying the Chapmans' claim. In support of this contention, the plaintiffs cite this language:

> The issue is not the defense which [the insurer] at trial finally settled on to defend the suit, but the reason it gave [the insured] for denying the claim.

*Bankers Life Ins. Co. v. Crenshaw,* 483 So.2d 254, 273 (Miss.1985) (citing *Aetna Life & Casualty Co. v. Lavoie,* 470 So.2d 1060 (Ala.1985).

The plaintiffs place too much reliance on this statement. The quoted language was written in response to the question posed just two paragraphs above it. As posed by Justice Hawkins, that question was, "since there was a jury question on whether the accident had any causal relation to the amputation ... how can punitive damages be assessed?" The answer clearly given by *Crenshaw* is that an insurer may not escape punitive damages merely by creating a jury issue on a defense to liability under the contract which is different from the reason for denying coverage which was given the insured. An explication of both *Crenshaw* and the case cited in support of the quoted language is necessary to bring this point into full relief.

Both Alabama and Mississippi apply the general rule that

> In the *normal* case in order for a plaintiff to make out a prima facie case of bad

---

**9.** Clearly if at trial the misrepresentation defense is not accepted by the finder of fact, the initial denial of coverage, if found to have been made without an arguable reason, may be considered as further evidence of Safeco's bad faith.

**10.** Obviously, the issue is more complex than this statement would suggest. The voiding of the contract *ab initio* cannot be said to make a tort disappear. However, under the Mississippi decisions, the tort of "bad faith" is so intertwined with the breach of the contract that the two cannot be divorced for present purposes.

faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the claim and, thus, entitled to recover on the contract claim as a matter of law. *National Savings Life Ins. Co. v. Dutton,* 419 So.2d 1357, 1362 (Ala.1982) (emphasis in original). *Compare Southern United Life Ins. Co. v. Caves,* 481 So.2d 764, 769 (Miss.1985) ("In the great majority of cases, where the insured is not entitled to a directed verdict on his underlying contract claim, it follows that the bad faith punitive damages issue should not be submitted to the jury."). Both *Crenshaw* and *Lavoie* are exceptional cases where this rule does not apply.

In *Lavoie* the insurance company denied Ms. Lavoie's claim for hospitalization benefits on the ground that hospitalization was not medically necessary. On four separate occasions, Aetna refused to pay the claim on this ground even though it had failed to submit all of the facts necessary for making this determination to its own in-house medical department, a step which was required by Aetna's claims processing rules. Aetna then created a jury issue at trial by having two doctors, who had by that time reviewed all of Ms. Lavoie's medical records, testify that it was their opinion that hospitalization was not medically necessary. Obviously, the jurors did not accept this testimony because they awarded 3.5 million dollars in punitive damages to Ms. Lavoie. On appeal, Aetna cited the general rule from *Dutton* and argued that the jury should not have been given a punitive damages instruction. The court held that Aetna was not entitled to the protection of the general rule merely because it was able "through evidence of its own creation [to raise] a factual dispute over the contract claim." *Lavoie,* 470 So.2d at 1072. The court went on to state that "an insurance company's bad faith is adjudged by what was before it at the time the decision to deny the claim was made." *Id.*[11]

In *Crenshaw,* the plaintiff, who had suffered for some time from poor circulation in his legs, was injured when he dropped an auto part on his foot. The injury eventually led to amputation of Crenshaw's leg below the knee. The insurance company refused to pay the claim that Crenshaw filed for the costs associated with the amputation on the ground that the injury was not caused solely by the accident independent of all other causes as required by the terms of the policy. Unfortunately for Bankers Life, such clauses had been held to be unenforceable in three previous Mississippi cases. In those cases, the Mississippi Supreme Court had held that an insured could recover "where the accidental injury aggravates ... a latent ... pre-existing condition" so long as the accident was a proximate cause of the loss. *Peerless Ins. Co. v. Myers,* 192 So.2d 437, 439 (Miss.1966). At the time Bankers Life denied coverage, its medical staff had seen only a small portion of Crenshaw's medical records, although it had arguably seen enough to determine that the accident was not the sole cause of the loss. At trial, Bankers Life tried to prove through the testimony of its in-house physician that if Bankers Life had gotten all of the medical records it should have gotten and if it had applied the definition of injury required by state law, it still would have denied coverage because Crenshaw's poor circulation problem was the sole proximate cause of the loss. This testimony created a jury issue on Bankers Life's contract liability. When Justice Hawkins wrote the language relied upon by the plaintiff in this case, he was responding to Bankers Life's argument that the question of punitive damages should not have been presented to the jury because Crenshaw was not entitled to a directed verdict on his contract claim.

In both *Crenshaw* and *Lavoie,* the trial court allowed the jury to consider the defense to contract liability which the insurance company raised for the first time

11. Although this is the rule in Mississippi as well, this should not be taken to mean that the company is insulated from punitive damages because it continues to rely on its initial denial which was made in good faith when it later is

given information which shows that coverage exists. *See Merchants National Bank v. Southeastern Fire Ins. Co.,* 751 F.2d 771, 777 (5th Cir.1985).

at trial. In neither case did the appellate courts criticize this decision, nor did those courts suggest that the lower courts had erred in so doing. In *Crenshaw*, the Mississippi Supreme Court did state that "Crenshaw could argue with some cogency Bankers Life should have been estopped to assert this variant defense for the first time at trial." *Crenshaw*, 483 So.2d at 273. This suggests that under Mississippi law, there is no independent rule that an insurance company must rely at trial on the first reason for refusing to pay the claim given the insured absent a showing that it has somehow waived the subsequently raised defense or that circumstances are such that the company should be estopped from asserting that defense. The facts of record for purposes of the present motion do not support a grant of summary judgment on either theory.

### III. CONCLUSION

This case presents several interesting legal issues which the court has attempted to resolve in an equitable manner. The body of the opinion, hopefully, speaks for itself on those issues. The summary judgment motions of both parties must be denied on all counts either because they are not supported by Mississippi law or because there are fact issues which must be resolved at trial which bar entry of summary judgment in favor of either party.

An appropriate order will be entered.