LAWYERS TITLE INSURANCE
CORPORATION, a Virginia
corporation, Plaintiff,

v.

FIRST FEDERAL SAVINGS BANK &
TRUST, a Federal savings
bank, Defendant.

No. 89–73372.

United States District Court,
E.D. Michigan, S.D.

July 13, 1990.

Stephen Glasek, Detroit, Mich., for plaintiff.

Andrew Broder and Maura Corrigan, Detroit, Mich., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I. INTRODUCTION

This is an action for declaratory judgment as to an insurers' liability on a policy of mortgage title insurance. Plaintiff Lawyers Title Insurance Corporation (Lawyers Title) issued a policy of mortgage title insurance (the policy) on a mortgage taken

by defendant First Federal Savings Bank & Trust (First Federal). Several months after the policy was issued, First Federal received notice that its mortgagor never actually had title to the property and the title documents were, in fact, forged. First Federal demanded that Lawyers Title defend it in litigation arising out of the mortgage transaction and indemnify it against any losses. Lawyers Title ultimately took the position that it was absolutely discharged from liability because at the time the policy was issued, First Federal had "knowledge or intimation" of a defect in title which it failed to disclose. Lawyers Title then filed this action for a declaratory judgment and First Federal counterclaimed for payment on the policy.

First Federal has filed a motion for summary judgment, arguing that the policy provisions authorize Lawyers Title to disclaim liability only when the insured had "actual knowledge" of a defect in title. It contends that there is no evidence that it possessed such knowledge at the time the policy was issued. Lawyers Title counters that its Commitment for Title Insurance (commitment) required notice to the insurer of any "knowledge or intimation" of a defect and therefore imposed a duty on First Federal to inquire into any suspicions it had concerning the insured transaction. The Court referred the motions to the magistrate who found that the "knowledge or intimation" language of the commitment was controlling and there was a genuine issue of material fact as to whether First Federal could be charged with awareness of a defect in the chain of its mortgagor's title. The Court disagrees and finds that it is the policy's requirement of "actual knowledge" which controls. Lawyers Title does not dispute the fact that no employee of the bank was in any way involved in the mortgagor's criminal scheme or had actual knowledge that the title papers were forgeries. Accordingly, First Federal's motion for summary judgment will be granted. The reasons follow.

## II. FACTS

On May 24, 1990, the Court ordered the parties to each file a statement of material facts not in dispute in separately numbered paragraphs. *Stepanischen v. Merchants Dispatch Transportation Corp.,* 722 F.2d 922, 931–32 (1st Cir.1983). From the statements so filed, the accompanying exhibits, and other papers in the record, the Court finds that the following facts are not in dispute:

1. In November, 1988, Henry L. Ewald (Ewald) contacted Joseph Michael (Michael), Senior Vice–President in charge of commercial lending at First Federal, about financing the purchase of a 426 unit apartment complex known as Westland Towers Apartments (Westland Towers). Ewald said that he could purchase the property for approximately $10,000,000 and that he would be willing to put up $3,500,000 of his personal savings if First Federal would provide the remaining $6,500,000. In support of his proposal, Ewald furnished First Federal with a personal financial statement, an independent appraisal of Westland Towers, and income and balance sheets. However Ewald did not provide First Federal with a preliminary agreement of purchase or make a formal written mortgage loan application.

2. First Federal lending policies require that all loans in excess of $1,000,000 be submitted to the Senior Loan Committee (the Committee) and approved by its board of directors. Michael, Mark Beatens (Beatens), First Vice–President in charge of commercial lending, and Joseph DiCicco (DiCicco), the loan officer in charge of the Ewald loan, were the bank officers directly responsible for processing the loan, preparing the loan package, and presenting it to the Committee for approval.

3. The loan package was presented to the Committee on January 6, 1989. Michael, Beatens, and DiCicco represented to the Committee that the proceeds of the proposed loan would be used to purchase Westland Towers, that the price would be determined by a neutral appraisal, and that the $3,500,000 down payment would come from Ewald's personal savings, which would be verified prior to closing. The Committee approved the loan on the basis of these representations.

4. Sometime after the meeting, however, Ewald informed Michael, Beatens, and Di-Cicco that he had already purchased Westland Towers outright from his own savings, but that he still wanted the $6,500,000 mortgage loan. Ewald said that $2,500,000 of the loan proceeds would be used to repay an unidentified third party who had financed the purchase and the remaining $4,000,000 would go to James Petcoff, a substantial customer of First Federal who wanted to form a medical malpractice insurance company.[1] Following the meeting with the Committee, Michael, Beatens, and DiCicco prepared an addendum to the loan package report reflecting this new information.

5. In preparation for the closing, First Federal directed Ewald to obtain a policy of mortgage title insurance. On January 17, 1989, Ewald and his attorney, Walter Sakowski (Sakowski), contacted Lawyers Title and requested $6,500,000 worth of title insurance on behalf of First Federal, representing that the titleholder to Westland Towers was Ewald's company, 426 co., inc., and that the purpose of the proposed mortgage was to "refinance" the property. First Federal never directly participated in the application for title insurance and made no representations of any kind to Lawyers Title.

6. On January 18, 1989, Ewald recorded a deed from H–G Westland Associates Limited Partnership (H–G) to 426 co., inc., with the Oakland County Register of Deeds. On that same day, Ewald also recorded discharges of two mortgages on Westland Towers held by the Riggs National Bank and Far West Savings and Loan Association (Riggs). Both the deed and mortgage discharges were forgeries.

7. The mortgage loan was closed on January 20, 1989. As part of the closing, 426 co., inc. executed a commercial form of mortgage granting First Federal a first lien on Westland Tower in the amount of $6,500,000. On the date of the closing, First Federal did not have a commitment for the issuance of mortgage title insurance from Lawyers Title because of certain problems with the discharge of the Riggs mortgages.[2] No funds were distributed at that time.

8. On January 23, 1989, Ewald or Sakowski revised the discharges of the Riggs mortgages. Lawyers Title subsequently delivered to First Federal a commitment for mortgagee title insurance in which Lawyers Title agreed to issue a policy insuring First Federal's $6,500,000 mortgage as a first lien on Westland Towers, subject to certain stipulated conditions and encumbrances. The commitment stated that 426 co., inc. was the title holder of Westland Towers free and clear of any liens or encumbrances, except those customary to outright ownership.

9. Immediately following the closing, First Federal asked Lawyers Title to pick up and record the January 20, 1989 mortgage. Lawyers Title did not record the mortgage with the Register of Deeds until January 27, 1989.

10. On January 24, 25, and 26, following receipt of the commitment showing 426 co., inc. as the title holder, checks totalling $6,500,000 were issued by First Federal directly to Henry Ewald.[3]

11. On February 23, 1989, a representative of Lawyers Title discovered that on January 26, 1989, the day before the first mortgage was recorded, a deed had been recorded in which Westland Towers was conveyed by 426 co., inc. back to H–G. Lawyers Title immediately contacted First Federal and informed them that its mortgagor was not the title holder of the property. First Federal had its attorney contact Ewald, who assured the attorney that it

---

1. Lawyers Title says that Michael, Beatens, and DiCicco were given this information prior to the January 6 Committee meeting and misrepresented Ewald's intended uses of the money. Even if true, these facts are not material. *See* §§ III and IV, *infra.*

2. A commitment customarily precedes the issuance of a policy of mortgage title insurance. *See* § III, *infra.*

3. The parties have not explained why the checks were made payable to Ewald personally rather than to 426 co., inc. Again, however, this fact is not material.

was a only a "mix-up." On February 27, 1989, Ewald recorded a deed from H–G back to 426 co., inc. and delivered a copy to Lawyers Title, which in turn issued a mortgage title insurance policy in the amount of $6,500,000 on March 9, 1989. At no time did any employee of First Federal ever see the forged deeds or mortgage discharges.

12. On October 2, 1989, First Federal was notified by representatives of H–G that the deeds from H–G to 426 co., inc. and the discharges of the Riggs mortgages were forgeries and that its mortgage was invalid. H–G subsequently filed an action in the Wayne County Circuit Court seeking to cancel First Federal's mortgage and quiet title. First Federal then filed a civil action against Ewald for fraud and breach of contract and asserted a constructive trust against Petkoff's medical malpractice insurance company. A portion of the loan proceeds were part of the general funds of the Petkoff's insurance company or on deposit with the State of Michigan. Ewald was indicted in the Eastern District of Michigan for acts associated with his criminal actions. On May 1, 1990, he pled guilty to one count of bank fraud, 18 U.S.C. § 1344. He is currently awaiting sentencing.

13. On October 4, 1989, First Federal filed a written claim with Lawyers Title for payment under the policy. Following an investigation, Lawyers Title disclaimed liability on the grounds that First Federal had "personal knowledge or intimation" of defects in 426 co., inc.'s title to Westland Towers. Specifically, Lawyers Title says that at the time the loan was made, First Federal was aware of the following facts which, taken together, should have been sufficient to put a reasonable person on notice of defects in its mortgagor's title to Westland Towers:

(a) In 1978, Ewald was convicted of bank fraud in two separate cases and subsequently served over a year in federal prison.[4]

(b) Ewald did not intend to use the bulk of the proceeds of the loan to finance the purchase of Westland Towers, but rather intended to finance Petkoff's malpractice insurance venture. Petkoff was an established customer of First Federal at that time, but could not obtain additional funds from First Federal because he was already deeply in debt and overextended;

(c) Ewald's personal financial statement reflected that 80% of his personal assets consisted of a $7,500,000 undescribed note, not yet due;

(d) The appraisal of Westland Towers reflected that the $6,500,000 mortgage loan being made by First Federal, which had a five year term and a floating interest rate of 2% over prime (then at 12½%) was to replace an assumable $6,200,000 HUD insured mortgage, which had a 24 year remaining term and a 7% interest rate;

(e) The appraisal disclosed that Westland Towers, which Ewald said he had purchased for $10,000,000, had been sold two years previously for $12,000,000 and had debts in excess of $13,000,000.

In addition, Lawyers Title says that First Federal failed to follow normal prudent lending procedures in making the loan to Ewald, and specifically failed to do any of the following:

(f) It never requested and Ewald never submitted a formal loan application or a purchase agreement for Westland Towers;

(g) When Michael, Beatens, and DiCicco became aware of Ewald's revised plans for the use of the loan proceeds, they failed to submit the loan package to the Committee for reconsideration in light of the changed circumstances;

(h) DiCicco never personally verified that the $3,500,000 down payment for Westland Towers would actually come from Ewald's personal savings;

(i) No independent investigation was ever conducted of Ewald or the assets listed in his personal financial statement.

---

4. First Federal denies that any of its officers were aware of Ewald's convictions. This dispute is immaterial, however, because Lawyers Title concedes that none of First Federal's employees had actual knowledge that the deeds were forged or were in any way involved in Ewald's criminal scheme.

First Federal does not dispute any of these assertions.

## III. WHICH DOCUMENT GOVERNS LAWYERS TITLE'S OBLIGATIONS

### A. *The Terms of the Commitment and Policy*

After a person makes an application for mortgage title insurance, a title insurance company generally first issues a commitment for title insurance. The commitment typically describes the current state of the property's title and binds the title company to issue a policy at some point in the future, subject to stated conditions. By its terms, a commitment is generally valid for only a stipulated period and thereafter lapses.

The commitment issued by Lawyers Title contained several exceptions describing risks for which it would not indemnify the insured. It also contained certain conditions which, if violated, would void the commitment and any subsequently issued policy *ab initio*. It stated in relevant part:

This Commitment is delivered and accepted upon the understanding that the party to be insured has no personal *knowledge or intimation* of any defect, objection, lien, or encumbrance affecting subject land other than those set forth herein and in the title insurance application. Failure to disclose such information shall render this Commitment, and any policy issued pursuant thereto, null and void as to such defect, objection, lien, or encumbrance.

[emphasis added]. The commitment also stated that:

This Commitment is preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate six (6) months after the effective date hereof or when the policy or policies committed to shall issue, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the company.

The terms of the mortgage title insurance policy subsequently issued differ in critical ways from those of the commitment. Specifically, in the section entitled Exclusions from Coverage, the policy states:

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, or attorneys' fees or expenses which arise by reason of:

(3) Defects, liens, encumbrances, adverse claims or other matters:

(b) not known by the Company, not recorded in the public records at Date of Policy, but *known to the insured claimant* and not disclosed in writing to the Company by the insured claimant prior to the date that the insured claimant became an insured under this policy;

[emphasis added]. The policy goes on to define the terms "knowledge" or "known" as "actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land." The mortgage title insurance policy also contains an incorporation clause, which states:

This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

### B. *Which Document Controls*

The problem presented by this case is whether the "knowledge or intimation" language contained in the commitment or the "actual knowledge" standard described in the policy define Lawyers Title's obligations under the agreement. The answer to this question cannot, unfortunately, be ascertained from the language of the documents themselves. They are inconsistent and contradictory on the point. The commitment exclusion provides that any knowledge or intimation of a title defect "shall render this commitment, *and any policy issued pursuant thereto*, null and void as to such defect ..." [emphasis added]. This

would appear from its terms to apply to both the commitment and the mortgage title insurance policy. However, as noted previously, the policy document contains a merger clause which provides that "[t]his policy together with all endorsements, if any, attached hereto by the Company *is the entire policy and contract between the insured and the Company.*" [emphasis added].[5] The parties have cited no cases suggesting which document might control. The magistrate said that the commitment controlled, but gave no explanation for his conclusion.

The problem at hand can best be analyzed as a case of contract substitution. It is hornbook law that parties to a contract are not forever locked into its terms. They are at all times free to alter, amend, or modify their agreement. Moreover, the parties may execute a substituted agreement which totally supersedes the terms of the original. It has been long settled in Michigan that:

> Where the parties to an existing contract enter into a new agreement, completely covering the same subject matter, but containing terms which are inconsistent with those of the earlier contract, so that the two cannot stand together, the effect is to supersede and rescind the earlier contract, leaving the latter agreement as the only agreement of the parties on the subject.

*Joseph v. Rottschafer*, 248 Mich. 606, 610, 227 N.W. 784 (1929). *See also Culver v. Castro*, 126 Mich.App. 824, 827–28, 338 N.W.2d 232 (1983); *Nib Foods v. Mally*, 70 Mich.App. 553, 560, 246 N.W.2d 317 (1976). The rule does not apply, however, where there is no intent to abrogate the first contract. *Joseph*, 248 Mich. at 611, 227 N.W. 784.

The terms of the commitment and mortgage title insurance policy involved here make clear that the latter was intended to supersede the former. As noted earlier, the commitment is intended to be only an interim agreement. By its terms, its obligations exist for only six months or until the policy of insurance is issued. The policy declares that it is the entire agreement between the parties. In addition, it is clear that the terms of the policy completely occupy the same subject matter as the commitment. Both instruments specifically disclaim liability if the insured withholds any material information as to possible defects in title. However, the documents are directly inconsistent in describing the level of awareness required before liability will be excluded; the policy requires actual knowledge while the commitment requires only knowledge or intimation. There is simply no way that these two standards can be reconciled. One must prevail over the other. Under the substituted contract rule described in *Joseph*, it is the later agreement which must control.

Lawyers Title contends that the integration clause does not prevent the Court from looking beyond the terms of the policy to the commitment. It cites *Chapman v. Safeco Insurance Co.*, 722 F.Supp. 285 (D.Miss.1989) and *State Farm Auto Insurance Co. v. Lee*, 343 F.2d 55 (5th Cir.1965) for the proposition that an integration clause in an insurance policy does not preclude an insurer from proving facts which would justify recision of the entire contract, such as fraudulent misrepresentations made in an application. The integration clauses involved in *Chapman* and *Lee*, however, are fundamentally different from that found in the Lawyers Title mort-

---

5. Lawyers Title has provided no explanation for the variance between the "intimation of defect" language in the commitment and the "actual knowledge" standard of the policy. The Lawyers Title policy form appears to incorporate the language of the American Land Title Association's (ALTA) Model Contract. *See* ABA Section of Real Property, *Title Insurance and You: What Every Lawyer Should Know*, 5 (1979). Lawyers Title seems to have eschewed the use of the ALTA Model Commitment for Title Insur-

ance, however. The ALTA Model Commitment, in harmony with the ALTA Model Contract, provides that the insurer shall be relieved of liability

> [i]f the proposed Insured has or acquires *actual knowledge* of any defect, lien, encumbrance, adverse claim, or other matter affecting the estate or interest or mortgage thereon covered by this Commitment....

*Id.* at 120. [emphasis added].

gage title insurance policy, and those cases are therefore of limited relevance.

The integration clauses in *Chapman* and *Lee*, which were essentially identical, stated:

> By acceptance of this policy the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

*Chapman*, 722 F.Supp. at 292; *Lee*, 343 F.2d at 57. They did not specifically exclude consideration of earlier documents, as does the integration clause in Lawyers Title's policy. Rather, they specifically made the obligations described in the policies conditional on the truth of the insureds' representations contained in their earlier applications. This language suggests no intention to supersede any of the representations made in the application; indeed it suggests precisely the opposite. Moreover, there was nothing inconsistent with the representations made in the application with those made in the policy. The two documents could be read as complementary. Therefore, it is doubtful that a substituted contract rule, even if followed in those jurisdictions, would have applied in any event.

Finally, the fact that the *Chapman* and *Lee* cases involved automobile insurance policies make any analogies to the case at bar extremely tenuous. Automobile insurance policies typically require the insured answer detailed questions in the policy application to allow the insurer to accurately evaluate the potential risk posed by the insured. Generally, material misrepresentations intentionally made by the insured on the policy application will be grounds for recision of the policy. Title insurance operates on a completely different principle. Instead of relying on the representations of the insured to evaluate the risk, title insurers undertake an independent professional search of the public records relating to the subject property in order to protect itself. *See Lawyers Title Ins. Corp. v. Research Loan & Investment Corp.*, 361 F.2d 764, 767 (8th Cir.1966). Obviously, an integration clause in an auto insurance policy would differ fundamentally from such a clause contained in a mortgage title insurance policy. Indeed, given the differences in language between the two clauses, comparing the two is like comparing apples and oranges. The Court is satisfied that nothing in either *Chapman* or *Lee* calls into question the Court's conclusion that the mortgage title insurance policy supersedes the commitment.

## IV. INTERPRETATION OF AGREEMENT UNDER AN ACTUAL KNOWLEDGE STANDARD

### A. Duty–to–Inquire Under Actual Knowledge Standard

█ Having found that the Lawyers Title mortgage title insurance policy holds an insured to a standard of actual knowledge, the Court must still determine precisely what the parameters of such knowledge are. Lawyers Title contends that even if the policy language controls, actual knowledge of a title defect will be imputed to an insured if he is aware of facts about the property which would prompt a reasonable person to make further inquiry. *See e.g. Enterprise Timber, Inc. v. Washington Title Ins. Co.*, 76 Wash.2d 479, 457 P.2d 600 (1969); *Applefield v. Commercial Standard Insurance Co.*, 176 So.2d 366 (Fla. App.1965), *cert. denied*, 183 So.2d 209 (Fla. 1965). Lawyers Title argues that an insured should not be permitted to wilfully ignore pervasive evidence of fraud and impropriety and thereby shift unanticipated risks onto an innocent insurer. In response, First Federal cites cases which hold that although there may be a duty-to-inquire under a notice or intimation standard, no such duty exists where an insurance policy requires that the insured have actual knowledge of a title defect. *Peoples Building & Loan Co. v. Safeco Title Insurance Co.*, No. 10569, 1988 Ohio App. LEXIS 2782, 1988 WL 72388 (Ohio App. July 5, 1988); *Zions First National Bank, N.A. v. National American Title Ins. Co.*,

749 P.2d 651 (Utah 1988); *International Charter Mortgage Corp. v. Commonwealth Land Title Ins. Co.*, 538 F.Supp. 1154 (D.P.R.1982). The Court finds the latter view persuasive.

■ Although not bound by any of the cases cited by the parties, *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119 (7th Cir. 1987), the Court is particularly persuaded by the reasoning of *Peoples Building & Loan v. Safeco*. There, the president of plaintiff Peoples Building & Loan, James Gastineau (Gastineau) extended to a borrower, Ronnie Bush (Bush) two mortgages on homes belonging to the Bush's in-laws and landlord. The proceeds of the mortgages were to be used by Bush in an elaborate speculative venture designed to generate substantial profits with which he could pay off his large debts, some of which were held by Gastineau. Bush had defrauded Gastineau on a previous occasion. Not surprisingly, the mortgages turned out to be forged and plaintiff made claims on certain title insurance policies issued by defendant. The mortgage title insurance policies in *Peoples Building & Loan* contained terms identical to those involved in this case. The trial court found that, although Gastineau did not know that the signatures were fraudulently obtained, the transaction was consummated "under circumstances that any reasonable man would have been on notice ... were very likely to be totally fraudulent" 1988 WL 72388, at 3, and therefore granted judgment for the insurer. The Ohio Court of Appeals reversed.

Although the Court of Appeals accepted the trial court's finding that Gastineau reasonably should have made further inquiries, it held that such an obligation was inapplicable in light of the policy's "actual knowledge" standard. The Court of Appeals found that defendant had not proven that Gastineau had actual knowledge of the fraud. The Court of Appeals criticized the trial court for its "tangled and confusing jurisprudence concerning three basic types of notice (Actual notice, implied notice, and constructive notice) and the frequent and often careless substitution of the word

'knowledge' for 'notice.'" 1988 WL 72388 at 4. A party receives actual notice when information is personally communicated to him. Constructive notice is that which the law views as sufficient to give notice of a given fact, such as publication. Implied notice will be imputed where a party obtains information or awareness of facts which would put a reasonably prudent man on inquiry.

Knowledge, the Ohio Court of Appeals noted, is quite different. Knowledge is what a person actually perceives while notice is what the law tells us that person is aware of even if it was never actually perceived. As Professor Pommeroy explained:

> If A, while dealing with respect to a piece of property, deliberately and intentionally refrains from making inquiries concerning outstanding encumbrances or claims for the very purpose of avoiding any information, he is charged with notice of the encumbrances and claims which are actually outstanding; but he certainly does not acquire, and cannot possibly have knowledge of such prior charges or interests.

2 *Pommeroy's Equity Jurisprudence* § 592 (5th ed. 1941), *quoted in Peoples Building & Loan*, 1988 WL 72388 at 6. Given that insurance policies must be construed against their drafters, the Court of Appeals stated that it could not interpret the term "knowledge" to be synonymous with "notice."

The *Peoples Building & Loan* court acknowledged the contrary holding of *Enterprise Timber, Inc. v. Washington Title Ins. Co.*, 76 Wash.2d 479, 457 P.2d 600 (1969), in which the Washington Supreme Court relieved a title insurer of liability on a fraudulent timber mortgage on the grounds that the insured failed to make further inquiry after being put on notice of the dubious reputation of the mortgagor. The Ohio Court of Appeals declined to follow *Enterprise Timber*, noting:

> Apparently the Washington court assumed that "knowledge" could be used as a synonym for "notice." We simply do not agree that such interchangeability

exists when a contract must be strictly interpreted.

1988 WL 72388 at 6.[6]

The Court finds this reasoning compelling. As in Ohio, Michigan courts are bound to interpret insurance contracts strictly against their drafters. *Powers v. DAIIE*, 427 Mich. 602, 398 N.W.2d 411 (1986). Moreover, as a matter of policy, the Court is reluctant to impose a duty of inquiry given the "actual knowledge" standard adopted by the language of the policy. Such a duty would seriously compromise the very purpose of mortgage title insurance. As First Federal notes, an insured would have no way of knowing how much information would be sufficient to put it on notice of an obligation to make further investigation. The guesswork that such an inquiry requires would undermine the very security that title insurance is supposed to afford.[7] It would also provide a title insurer a ready escape clause when a title transfer goes sour. In this area, more than perhaps any other, bright line rules are required to protect both the title insurance industry and those who depend on it. If Lawyers Title finds that today's ruling imposes too great a burden on its business, it can remedy the situation by simply revising the terms of its mortgage title insurance policy form to substitute an "intimation of defect" standard for the existing "actual knowledge" language.[8]

**6.** Lawyers Title also cites *Applefield v. Commercial Standard Insurance Co.*, 176 So.2d 366 (Fla. App.1965), *cert. denied*, 183 So.2d 209 (1965) in support of its duty-to-inquire position. In *Applefield*, the Florida Court of Appeals held that "means of knowledge, with the duty of using them, are in equity, equivalent to knowledge." *Id.* at 377. To the extent that *Applefield* conflates the concepts of "notice" with "actual knowledge," the Court rejects it for the reasons expressed in the *Peoples Building & Loan* case.

However, *Applefield* may not even be analogous to this case because the mortgage title insurance binder involved there provided that it was issued on the understanding that "the insured had no personal knowledge *or intimation* of any defect, objection, lien, or encumbrance affecting the premises...." *Id.* at 374. [emphasis added]. No policy was subsequently issued and therefore there was no "actual knowledge" standard involved in that case. The "knowledge or intimation" language used in the *Applefield* binders may well impose a duty-to-inquire which is absent under the "actual knowledge" standard in Lawyers Title's policy form.

**7.** It is ironic that in its promotional materials, Lawyers Title repeatedly represents to prospective customers that a primary purpose of title insurance is specifically to protect buyers from the risks of forged instruments. In *Questions & Answers About Title Insurance for Prospective Homeowners*, Lawyers Title states:

[Even a diligent attorney] cannot be sure ... that all signatures on all recorded documents are genuine.... Among other[ ] [things that crop up] are such things as fraud....

In addition, in its publication *The Security of a Home Is No Better Than Title To The Property*, Lawyers Title states:

There are many title troubles that can arise to cause the loss of your home—or your business property—or your mortgage investment.....

1. Forged personation of the true owner of the land.
2. Forged deeds, releases, etc.

In the publication *Don't Gamble With Your Mortgage Money—You Just Might Lose*, Lawyers Title states:

[I]f you invest in real estate loans without requiring complete title protection, you are taking a chance.... There's always a chance that ... there could be a hidden title defect that even the most thorough search wouldn't uncover. Defects such as fraud, forgery, [etc.].

Finally, in *Real Detective Thrillers from the Files of the Lawyers Title Insurance Corporation*, Lawyers Title warns prospective property buyers of the perils of hidden title defects with a series of brief stories extolling the not-so-subtle moral "Don't Let This Happen To You, Men!" In the story of "The Fun Loving Forger Who Bilked Lenders for $3 Million," Lawyers Title tells of a respected real estate broker who, needing money to finance a lavish lifestyle,

mortgaged large properties, 'released' the mortgages via forged mortgage releases.... Brazenly the forger recorded the bogus mortgage 'releases' with the land offices—then remortgaged the property over and over, pocketing the proceeds.... Losses? Several million dollars.... covered by insurance, fortunately.

"Physician, heal thyself." Luke, iv, 23.

**8.** Although neither of the parties have briefed the point, the Court's own research has disclosed a number of Michigan cases discussing the duty-to-inquire rule. In *Deputy Commissioner of Agriculture v. O & A Electric Co-Operative, Inc.*, 332 Mich. 713, 716, 52 N.W.2d 565 (1952), the Michigan Supreme Court noted: "Knowledge of facts putting a person of ordinary prudence on inquiry is equivalent to actual knowledge of the facts which a reasonably diligent inquiry would have disclosed." *See also*

## B. *Silent Fraud and Misrepresentation*

 Finally, Lawyers Title argues that there is a genuine issue of material fact as to whether First Federal committed an innocent misrepresentation or silent fraud in this case. Under Michigan law,

> [1] in a transaction between [two parties], [2] any representations which are false in fact [3] and actually deceive the other, and [4] are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, [5] where the loss of the party deceived inures to the benefit of the other.

*United States Fidelity & Guaranty v. Black*, 412 Mich. 99, 116, 313 N.W.2d 77 (1981), *quoting* 37 Am.Jur.2d, *Fraud and Deceit*, § 120. Such fraud may be consummated by the suppression of facts as well as by openly false assertions. *USF & G*, 412 Mich. at 125, 313 N.W.2d 77. In addition, parties to a contract have a continuing obligation to act in good faith and must disclose subsequently acquired information if suppression of such information would render previously conveyed representations untrue or misleading. *Id.* at 127, 313 N.W.2d 77.

 The Court is of the view that the doctrines of silent fraud and innocent misrepresentation are inapposite to the present case. First Federal made no affirmative representations to Lawyers Title in the process of procuring mortgage title insurance. Significantly, it did not apply for the mortgage title policy and the commitment showed 426 Co., Inc. as the title holder. Lawyers Title was expected to undertake a professional examination of the state of the title and reach an independent conclusion as to its status. Whatever obligations of inquiry and disclosure might be dictated by the common law in this case were superseded by the express duties imposed by the commitment and policy.

## V. CONCLUSION.

It is unclear exactly what Lawyers Title expected of First Federal. Lawyers Title was paid to insure the first lien on the mortgage for Westland Towers and not to second guess First Federal's wisdom in making the loan to Ewald. The fact is that Lawyers Title failed to detect the forged documents in its title search, even though it physically examined the documents and itself had actual knowledge of possible title defects before it issued the policy. *See* § II, para. 11, *supra.* Lawyers Title seems to be saying that if First Federal had only told it that they were dealing with a crook at the outset, it would have looked at the title documents more carefully. However, nothing in the terms of the mortgage title insurance policy requires that an insured investigate a borrower in this way. The purpose of mortgage title insurance is to make the insurer the guarantor of its own title search. In this case, Lawyers Title insured First Federal against the possibility of a forgery and it must now make good on its promise.

Accordingly, First Federal's motion for summary judgment is GRANTED. The

---

*McDonald v. Robertson*, 104 F.2d 945, 948 (6th Cir.1939) (same). However, the Court is not persuaded that these cases necessarily control the decision here.

First, none of the Michigan duty-to-inquire cases involve insurance contracts. As noted earlier, such contracts are strictly construed against their drafters. Second, the Michigan duty-to-inquire cases seem to use the terms "notice" and "knowledge" more or less interchangeably. Out of the four duty-to-inquire cases the Court has found, two seem to stand for the rule that knowledge of facts putting a reasonable person on inquiry is tantamount to "actual knowledge," *O & A; McDonald,* while the other two suggest that such facts are only equivalent to "constructive notice," *Cherry River Bank v.*

*Wallace,* 329 Mich. 384, 389–90, 45 N.W.2d 332 (1951); *Holly Lumber & Supply Co. v. Friedel,* 271 Mich. 425, 429, 261 N.W. 70 (1935). The Court finds it extremely doubtful the duty-to-inquire rule discussed in *Cherry River* and *Holly Lumber* is separate and distinct from the duty-to-inquire rule represented by *O & A* and *McDonald.* Rather, it is more likely that the use of the term "knowledge" in *O & A* and *McDonald* was inadvertent and of no practical consequence. It was precisely this kind of careless use of terminology that the Ohio Court of Appeals aptly criticized in *Peoples Building & Loan.* The Court is satisfied that, notwithstanding the use of the term "actual knowledge" in some of the cases, the question of whether intimation of a fact is tantamount to actual knowledge of that fact is an open one in Michigan.

Deputy Clerk will set a date for a trial on damages.

SO ORDERED.